## WETMORE vs. THE ATLANTIC WHITE LEAD COMPANY.

The effect of the act of the legislature of March 31, 1848, as amended in 1850, (*Laws of* 1848, *ch.* 156; *Laws of* 1850, *ch.* 313,) authorizing the owners of certain lands on the East river in the city of Brooklyn to erect, construct, build and maintain bulkheads or wharves on the lands under water in front of their lands, as far into the river as the permanent water line established by the act of 1836, was to convey and confirm to such owners a title to the lands under water in front of their premises, as far as the exterior line of 1836, or to the use of them for piers or bulkheads, so far as the state was concerned.

And so far as any other individuals, or the public at large, are concerned, the act of March 31, 1848, must be construed as conferring upon the owners of lands therein mentioned an absolute and exclusive right to the possession and enjoyment of wharves, bulkheads, &c. erected by them in front of their lands, up to the permanent water line established in 1836.

Wetmore *v.* The Atlantic White Lead Company.

The public rights of navigation and passage were relinquished by the act of 1848, in respect to the land under water in front of the property of the persons mentioned in the act, and not in front of the streets. And when wharves have been erected by such persons in front of their lands, the only access of the public to the navigable waters of the stream is by the existing highways upon the land or their direct prolongation or continuation.

If there is no public highway running through the land so made by the proprietors in front of their premises, neither the public nor an individual has a right to use the wharves erected thereon, for the purpose of reaching an adjacent street, against the will of the owner, on the ground that the wharves having been erected upon ground covered with the waters of a navigable river, cannot be appropriated to private use, but must still continue a highway.

A building below low water mark is not in itself a nuisance. Whether it be so or not depends upon its effect upon the channel or the navigation of the stream, and is always a question of fact.

It is impossible, in the face of the act of 1848, and of the act of 1836, establishing a permanent bulkhead line in front of the city of Brooklyn, to regard the appropriation of the waters of the East river by wharves erected by the property owners mentioned in the first named act, even as a purpresture; but if it were so, it would not follow, as long as the wharves were not a nuisance, that a private individual could either abate them, or enter upon them without the consent of the owners. *Per* EMOTT, J.

In the absence of any pretense that the channel, or the navigation, have been injuriously affected by such wharves, no right to abate or to pass over them, can be asserted against them as a nuisance.

The acts of the legislature authorized an appropriation of the lands under water, by an artificial accretion to the adjoining lands. They permitted the conversion of the premises from water into land, and relinquished the rights of the public to their use as a part of the channel of the river. When reclaimed, and covered with artificial structures, they became a part of the bank of the river, and were no longer subject to the public easement which affected the channel.

As far as such artificial accretions are made to public highways upon the bank of a shore, they become a part of such highways; but when added to a portion of the bank over which no such right of passage existed, they are a gain to the adjoining proprietor, and do not bring with them a right of use or passage over the land, in consequence of the right of navigation which had existed over the waters that had been displaced by such additions to the land.

THE complaint in this action alleged that the defendant, in June and July, 1860, occupied certain lands in Brooklyn fronting on East river. That said lands were and are beyond

and below low water mark, and the East river is an arm of the sea and a public highway. That the front of said premises is a bulkhead or wharf where vessels engaged in commerce lie, moor, lade and unlade, &c., and the legal and customary use of such a structure is such use and occupation by vessels. That the plaintiff was owner of certain vessels used in the transportation of merchandise, and prior to June 20, 1860, was engaged in transporting merchandise in one of such vessels from New York to Brooklyn, having contracted to deliver the same to Messrs. Longman & Son of Brooklyn, and deliver the same to them at the wharf, bulkhead or pier nearest to the place of business of Longman & Son, and most accessible to them, that should be found vacant and unoccupied, and to which the vessel could be safely moored. That Longman & Son's place of business was in Marshall street, between Gold street and Hudson avenue. That the plaintiff proceeded with said vessel and merchandise to perform such contract. That on June 20, 1860, the plaintiff's vessel arrived with such merchandise at the bulkhead or wharf in front of premises occupied by the defendant. No vessel was there, and it was the nearest and most accessible to Longman & Son's. The vessel was duly moored to said bulkhead or wharf, and the usual preparations made to discharge and deliver the merchandise. That the defendant obstructed and prevented such unlading and discharge and delivery, and continued to obstruct and prevent the same for 14 days, to the damage of the plaintiff of $140. The answer avers: That the defendant is owner of the lands, premises and bulkhead and wharf. That the same were gained out of the East river below original low water mark, by the defendant or its predecessors, in estate, by the erection of the bulkhead and filling in with solid substances. Denies that at the time the same were so gained out of the East river, that portion of the East river now converted into said lands, bulkhead, &c. was or ever since hath been or is a public highway. Denies that the public had, on the 20th June, 1860, or since, any right

of way over said lands, premises, &c. Alleges that the defendant, or its predecessors, erected said bulkhead as part of its lands, and for the purpose of gaining the same out of the East river, and for the private use only of the then present or future proprietors, and has hitherto kept said bulkhead, lands, &c. inaccessible for use as a wharf on the part of the public, or any person, but the proprietors and their servants, and has inclosed the same by a wall or fence having gates for such private use, and that the bulkhead has never been used as a wharf by the public, or any persons, but the proprietors and their servants. That the lands have been and are exclusively occupied by the defendant for the manufacture of white lead, and access to the bulkhead from and over the land can be obtained only through lands of the defendant, and that said bulkhead is not susceptible of use by the public, except by the additional use of the defendant's land as a highway, and great injury, &c. to the defendant. Denies that vessels engaged in commerce, other than the vessels of the defendant and vessels engaged in its business, have been accustomed to use said bulkhead, or that the bulkhead was constructed for such use except by vessels of the proprietors of the premises, or vessels engaged in their business. Admits that the plaintiff's vessel came there on 20th June, and moored at said bulkhead, no other vessel being there, and the master claimed the right to unlade and discharge the cargo, and insisted the defendant should remove the fence on the edge of the bulkhead, or open the gates therein; which the defendant denied and refused to do, as it had a right; and while said vessel lay along side said bulkhead kept the gates fastened, and thus obstructed and prevented the unlading and discharge of said cargo. As to all other allegations not answered, the defendant alleged that it had no knowledge, &c.

The action was tried at the King's county circuit, in March, 1861, before Justice Brown and a jury. The following facts appeared, on the trial.

The defendant occupied, on June 20, 1860, a bulkhead or wharf, land and premises, on the East river, extending northerly from Marshall street out into the East river, and easterly from Gold street to Hudson avenue. All such bulkhead, land and premises, were and are beyond and outside of original low water mark. The easterly portion of said premises lying east of line A was filled in and made land upon the bed of the East river, in the year 1825, by Clarke & Coster, excepting the pier, as now existing, which was constructed in 1836. In 1855 and 1856, deeds were made and executed to the defendant, purporting to convey in fee the southerly part of this portion of said premises, and in 1858 a deed was made and executed by Smith & Bulkley to the defendant, purporting to convey in fee the residue of this portion of said premises, subject to the rights of the public, if any. The portion of the premises lying west of line A, excepting a narrow strip thereof on the north side of Marshall street, was filled in and made land upon the bed of the East river, and the present bulkhead or wharf built between the years 1843 and 1845, by Valentine G. Hall. In 1845 a deed was made and executed by Hall and wife to the defendant, purporting to convey in fee part of this portion of the premises, and in 1849 a deed was made and executed by John G. Murphy and wife to the defendant, purporting to convey in fee the residue of this portion of said premises. Marshall and Gold streets and Hudson avenue, (formerly called Jackson street,) have been for thirty years and upwards and still are public streets, the latter extending to the river. Down to the year 1858, all the land east of line A, north of a line 100 feet north from Marshall street, was vacant and uninclosed, except that Morrison, who collected wharfage from vessels using the pier, had a gate on Hudson avenue a portion of the time, which he closed at night. Both the pier and the bulkhead have been used by vessels, without discrimination, since they were respectively constructed. Shortly before June 20, 1860, the plaintiff being the owner of barges engaged in the trans-

portation of goods, &c. for hire, contracted with Randolph & Skidmore to transport in one of his barges, coal from the city of New York to Messrs. Longman & Son, doing business in Marshall street, between Gold street and Hudson avenue, in Brooklyn, and to deliver the same at the nearest place to Longman & Son, either Gold street or Hudson avenue. The plaintiff's barge proceeded with said coal, and came, June 20, 1860, to the bulkhead in question, the same being the nearest to Longman & Son, and the only vacant wharf, bulkhead or pier near them, and being then unoccupied. The barge was moored to the bulkhead, and preparations made to unlade and discharge the cargo. The pier was at that time piled up with brick, so that the cargo of the plaintiff's barge could not be discharged there. The defendant had erected a fence along the edge of the bulkhead, with gates, through which goods and merchandise were constantly carried to and from other vessels, and laden and unladen therein and therefrom. On the arrival of the plaintiff's vessel these gates were closed and fastened, and kept so closed and fastened by the defendant, to prevent the unloading of said cargo and the use of said bulkhead or wharf by the plaintiff's vessel; and the defendant obstructed and prevented the unlading and discharge of said coal, and forbade the master of the vessel to lie at said bulkhead. From the place where the plaintiff's vessel lay there was abundant vacant and unoccupied space of ground along and over the outer portion of the bulkhead, within the fence to and over the ground lying east of line A, out into Hudson avenue, wide enough for horses and carts, and through and over which horses and carts have been accustomed to travel in transportation of merchandise, to and from Hudson avenue and vessels lying at said bulkhead and pier, continuously, since the pier and bulkhead were made. The East river is a navigable stream or arm of the sea.

The testimony being closed, his honor the justice directed the jury to find a verdict for the plaintiff, and directed the

jury to assess and find the amount of damages sustained by the plaintiff by the obstruction and detention complained of and proven. To which the defendant's counsel excepted, on the ground that on the pleadings and proofs the plaintiff is not entitled to recover. The jury rendered a verdict for the plaintiff for $75 damages. His honor the justice directed that the exceptions in this cause be heard in the first instance at general term, and the entry of judgment to be suspended in the meantime.

*N. B. Hoxie,* for the plaintiff. I. Every navigable stream or arm of the sea is a public highway. (*Angell on Tide Waters,* 2d ed. *p.* 112.) Every citizen is entitled to the free use of such highway, including access to the public streets and roads upon the adjoining land from the water, and to the water from the land. A public road or street leading to a navigable river and such river form together a continuous highway. (*People* v. *Lambier,* 5 *Denio,* 9.)

II. The title to all lands lying under the waters of an arm of the sea, such as the East river, is in the sovereign, i. e. the state, in trust for, and subject to, the use by the public of such waters as a highway. (*Carter* v. *Murcott,* 4 *Burr.* 464. *Arnold* v. *Mundy,* 1 *Halstead's N. J. R.* 1. *Angell on Tide Waters,* 2d ed. *pp.* 207, 270. *Angell on Water Courses,* 4th ed. *p.* 558, §§ 542, 559. *Arundel* v. *McCullough,* 10 *Mass. R.* 70. *People* v. *Mauran,* 5 *Denio,* 389, 395. *Com'rs of Canal Fund* v. *Kempshall,* 26 *Wend.* 413, 420. *Canal Com'rs* v. *The People,* 5 *id.* 444, and 17 *id.* 590.).

III. No individual can acquire any title to such lands, except by express grant from the state. (3 *Kent's Com.* 8th ed. 505, 507, 521 ; *marg.* 413, 414, 427. *Brinckerhoff* v. *Starkins,* 11 *Barb.* 248.) And any title so acquired is subject to such public use. (*Cases cited supra. Hale de Jure Maris, part* 1, *ch.* 5, *Hargrave's Law Tracts, pp.* 22, 36. *Furman* v. *City of New York,* 5 *Sandf. S. C. R.* 33.)

IV. An individual cannot by any addition to or change

of form of a highway, deprive the public of as full and free use of such addition or modification as belonged to and was had and enjoyed of the highway before such addition or modification. Such change of form cannot change the use. (*Angell on Tide Waters,* 2d ed. *pp.* 64, 218. *Commonwealth* v. *Wright,* 3 *Am. Jurist,* 185. *Rogers* v. *Jones,* 1 *Wend.* 237, 261.)

V. Every structure or erection upon such a highway which is adapted to or extends the use thereof as a highway, necessarily partakes of the same public character, and becomes part of the highway. It is considered as dedicated to the public use. (*Blundell* v. *Catterall,* 5 *Barn. & Ald.* 268, 277, 301, 305, 314. *Bolt* v. *Stennet,* 8 *T. R.* 606. *Commonwealth* v. *Wright,* 3 *Am. Jurist,* 185. *Heaney* v. *Heeney,* 2 *Denio,* 625. *Lansing* v. *Smith,* 4 *Wend.* 20. *Gould* v. *Hudson River R. R.,* 12 *Barb.* 628. *Furman* v. *City of N. Y.,* 5 *Sandf.* 43. *Hale de Portibus Maris, chap.* 7, *Harg. L. T. pp.* 84, 85. *New Orleans* v. *United States,* 10 *Peters,* 662, *McLean, J. p.* 715. *Hart* v. *Mayor &c.,* 3 *Paige,* 217.)

VI. If any structure or erection is made which is not susceptible of such public use, or if so susceptible the public is excluded from such use, it is an obstruction of the highway, a purpresture, a nuisance. (*Bacon's Abr., Nuisance A. Hale de Jure Maris, chap.* 5, *Harg. L. T. p.* 36. *Hale de Portibus Maris, chap.* 7, *Id.* 845. *Woolrych on the Law of Waters, pp.* 159, 165. *Rex* v. *Ward,* 4 *Adol. & Ellis,* 384, 404. *Regina* v. *Randall,* 1 *Car. & Marsh.* 496. *Rex* v. *Russell,* 6 *Barn. & Cress.* 594. *Hart* v. *Mayor &c.,* 3 *Paige,* 213, and 9 *Wend.* 571. *Shaw* v. *Crawford,* 10 *John.* 236.) And no lapse of time will legalize it. (*Angell on Water Courses, p.* 271, § 254. *Mills* v. *Hall,* 9 *Wend.* 315. *Woolrych on Waters, p.* 165.)

VII. Every person erecting or maintaining such a structure, and excluding any person from such public use thereof, is liable to such person for all loss and damage thereby sustained. (*Hecker* v. *Balance Dock Co., Sup. Ct. 1st dist.*

1857. *Lansing* v. *Smith*, 8 *Cowen*, 161, 165, 166, and 4 *Wend*. 25. *Chichester* v. *Lithbridge, Willes,* 71. *Corning Lowerre,* 6 *John. Ch. R.* 439. *Pierce* v. *Dart,* 7 *Cowen,* 609. *Rose* v. *Miles,* 4 *Maule & Selw.* 101.)

VIII. A bulkhead, wharf or pier erected in or upon the East river, beyond low water mark, upon the lands of the state, inasmuch as its obvious and natural purpose is to advance the use and benefit of such a highway, must necessarily be public, in like manner as a turnpike or plank road. (*Hale de Portibus Maris, chap.* 6, *Harg. L. T. pp.* 76, 7. *Cases cited supra, V.*) And so, whether erected with or without the permission of the legislature. (*Furman* v. *City of N. Y.,* 5 *Sandf.* 43. *Lansing* v. *Smith,* 4 *Wend.* 26.) (1.) The river front of the city of Brooklyn is a component part of the port or harbor of New York, open to the commerce of the world. The first necessity of a commercial port is free and abundant access to and from the land and water. (2.) Wharves are constructed for the uses and benefits of commerce, and necessarily require for the subservience of such uses, and the promotion of such benefits, freedom of access from the land and from the water. (*Hale de Portibus Maris, chap.* 2, *Harg. L. T. p.* 46. 3 *id.* 50. *Angell on Highways, p.* 51, §§ 73, 74.) (3.) The legitimate and necessary use of a wharf comprises not only the lying and mooring, lading and unlading of vessels thereat, but also freedom of access on and over it, to and from such vessels, i. e. the ordinary use of a highway for conveyance of persons and property, and the additional use for mooring vessels. (*Hale de Portibus Maris, chap.* 7, *Harg. L. T. pp.* 84, 85. 6 *id.* 76, 77. *Rex* v. *Russell,* 6 *B. & C., Bailey, J.,* 594, 595.)

IX. The bulkhead and pier, and the made land occupied by the defendant, being built and made on the bed of the river, appropriated and occupied that portion of the river on and over which the plaintiff's barge might and would have been navigated up to the westerly side of Hudson avenue. And such bulkhead and pier, and made land, having

destroyed such method of access to the public street, became, were and are affected and charged with the same public servitude or use, i. e. a right of way, and carriage of the vessel's cargo over such land to said public street. They became a highway by necessity. When the law gives a right of way over the private land of an individual who has obstructed or impaired an adjoining highway, *a fortiori*, should such right of way be given over land belonging to the state, approriated by an individual, who by such appropriation obstructs or prevents access to the highway. (*Woolrych on Ways, p.* 49.) This bulkhead, pier and made land have been in fact dedicated to the public use. (*Angell on Highways, p.* 51, § 74. *City of Cincinnati* v. *White,* 6 *Peters,* 431. *Barclay* v. *Howell, Id.* 498. *Shaw* v. *Crawford,* 10 *John.* 236.)

X. The interference with and deprivation of the plaintiff's right so to use said bulkhead and land caused a loss and damage special and peculiar to him, for which the defendant is liable. (*Cases supra, VI, VII. Woolrych on Ways,* 51, 53. *Wiggins* v. *Boddington &c.,* 3 *Car. & Payne,* 544. *Greasly* v. *Codling,* 2 *Bing.* 263. *Wilkes* v. *Hungerford Market Co., Id.* 281.)

XI. All the right, title and interest of the defendant in the premises in question are derived from the following sources: The deed from Hall and wife in 1845 ; the deed from Murphy and wife in 1849 ; the deeds from Brown and others in 1855 and 1856; the deed from Smith & Bulkley in 1858 ; and the act of the legislature passed 1848. (*Laws of* 1848, *ch.* 156, *amended by act passed* 1850. *Laws of* 1850, *ch.* 313.) (1.) As to the deeds, all the property therein mentioned was outside of low water mark, and belonged to the state. And there is no claim or pretense that any of the grantors in any of the said deeds ever received directly or derivatively any grant from the state. The description of the premises in the several deeds is peculiarly significant. (2.) As to the act of the legislature, it was prospective, and the land and bulkhead and pier, as now existing, had been

made and constructed several years before the passage of the act, without authority and in violation of law. The act declares "*It shall be lawful*," &c. It was clearly unlawful before the passage of the act. (3.) But if the act in question could be considered retroactive, or as legalizing the continuance of the bulkhead, &c., it gives the defendant no right or title to an exclusive property in or enjoyment of the land, bulkhead, &c. in question. (*a.*) The act gives a *license* to certain persons owning lands fronting on the water, "to erect, construct, build and maintain bulkheads or wharves, and to fill in the same on the lands under water in front of their lands." (*b.*) No words expressing or implying a grant of the lands under water are to be found in the act. A franchise alone is given, i. e. a right to erect and maintain bulkheads and wharves, for the use of which certain emoluments are provided by the laws regulating wharfage. (2 *Chit. Bl.* 38, *marg.*) (*c.*) No change from public to private use is expressed or contemplated. The privilege given is in the usual form of grants of right to construct wharves, &c., a valuable franchise. (*Angell on Tide Waters*, 2d ed. *p.* 64. *Beekman* v. *Saratoga and Schenectady R. R.*, 3 *Paige*, 73.) (*d.*) No grant of the land, or of any exclusive property in or enjoyment of the bulkheads or wharves, the construction of which is thus legalized, can be inferred from the act. There is no room for any such inference. The language of the act is clear and specific, and the privilege granted expressly limited. The absence of any express words allowing wharfage is immaterial. No such provision is necessary, inasmuch as the right to wharfage is a necessary incident to the right to build and maintain a wharf, and attaches to the person to whom the franchise is granted. (*Lansing* v. *Smith*, 4 *Wend.* 23.) The general wharfage act, fully providing for the case, renders any such provision in this act superfluous, and its absence cannot operate to turn the grant of privilege into a grant of the fee, or any exclusive property in that which by the law of the land is common, (*People* v. *Lam-*

*bier,* 5 *Denio,* 9.)  The well settled rules as to the construc- . tion of such statutes forbid any such inference.  All grants of privilege are to be liberally construed in favor of the public ; and as against the grantees of the monopoly, franchise or charter, they are to be strictly interpreted.  Whatever is not unequivocally granted in such acts is taken to have been withheld.  Statutes interfering with the general rights of the subject, establishing monopolies and imposing penalties, are to be strictly construed.  (*Sedgwick on Stat. and Const. Law, pp.* 338, 340, *and cases cited.  People* v. *Lambier,* 5 *Denio,* 9.  *Lansing* v. *Smith,* 4 *Wend.* 22, *&c.  Sprague* v. *Birdsall,* 2 *Cowen,* 419.)  Such an inference is repugnant to public policy and good faith.  There is no consideration for a grant of exclusive property or enjoyment.  No benefit or advantage would accrue to the state as proprietor, or as trustee for the citizens.  (2 *Chit. Bl.* 38.)  On the other hand, the recompense for the franchise of constructing and maintaining wharves open to the public use would, by the enhancement of the commercial interests and prosperity of the community, be inevitable and abundant.  Such an infer- ence is at war with the uniform course of legislation upon such subjects.  The provisions of the acts authorizing the commissioners of the land office to grant lands under water : (1 *R. S. pt.* 1, *ch.* 9, *tit.* 5, *art.* 4 ; *Laws of* 1835, *ch.* 232, *p.* 276, § 1 ; 1843, *ch.* 239, *p.* 342 ; 1850, *ch.* 283, *p.* 621 ;) the various acts for the preservation and improvement of the harbor of New York : (*Laws of* 1836, *ch.* 484, *p.* 739, § 2 ; 1855, *ch.* 121, *p.* 191 ; 1856, *ch.* 203, *p.* 343, § 2 ; 1857, *ch.* 763, *p.* 638, *vol.* 2 ;) the several acts regulating the use and protection of wharves, &c. in the harbor: (*Laws of* 1837, *ch.* 263, *p.* 278, § 5 ; 1848, *ch.* 2, *p.* 3 ; 1850, *ch.* 144, *p.* 242, *tit.* 11, § 17 ; 1857, *ch.* 671, *p.* 487 ; 1858, *ch.* 261, *p.* 413 ; 1860, *ch.* 254, *p.* 416 ;) all evince a jealous regard for the interests of commerce, and the determination that no obstruction to or infringement upon the legitimate commercial use of all the wharves in the harbor shall be tol-

erated. And the phraseology of the several acts referred to shows that all the wharves in the port or harbor of New York are open to public use. The use in any of these acts of the words *"private wharves"* is not a recognition of a private *use*, but only of a private *proprietorship* or *interest* in the franchise, growing out of circumstances attending the construction, and distinguishing them from public wharves solely in that respect, i. e. wharves constructed in the city of New York on land under water, but upon land belonging to the city of New York, in fee, and by that city granted to individuals. The use of public and private wharves is the same, and no distinction can be made between them as to such use, except so far as the same is directed or allowed by law. The acts setting apart certain wharves in the city of New York for canal boats, and giving power to the city of New York to do likewise as to steamboats, &c., show that express legislation was necessary to secure such exclusive use. And even these exclusive uses are for *public purposes*—not those of an individual—and are the usual commercial uses. (*Laws of* 1858, *ch.* 261.) Such an inference is inconsistent with the course of judicial decisions upon the subject. (*Cases cited supra, points V, VI, VII, VIII.*) (4.) The only effect of an act of the legislature authorizing an individual to build a wharf or bulkhead in or upon a navigable river, is to give him a right to collect the usual wharfage for its use. If he so constructed without an act, he could not demand any compensation for the use by the public. (*Angell on Tide Waters,* 2d ed. 208, 9.) (5.) If the act by express words, or necessary inference, purported to grant the land under water, or the land, bulkhead and wharves, to be constructed thereon, or the exclusive use and enjoyment thereof, it would be void, because it was not passed by a two-thirds vote, as required by the constitution of the state. (*Const. of* 1846, *art.* 1, § 9. 1 *R. S. pt.* 1, *ch.* 8, *tit.* 4, §§ 2, 3, 13, 15, 16.)

XII. The right claimed by the plaintiff to land the cargo of his vessel at this bulkhead, and transport the same with-

out delay over the bulkhead and made land into Hudson avenue, was a right to the legitimate and customary commercial use of the bulkhead, &c., and the precise use thereof, contemplated by the act of the legislature referred to, and all considerations of inconvenience resulting to the defendant, by reason of such use, are immaterial and inadmissible.

XIII. The inconvenience and injury suggested by the defendant's witnesses, were to the manufacturing business carried on in and upon the bulkhead, &c., not to the legitimate commercial use by them, in common with others of the bulkhead, wharf, &c., nor to the legal emoluments accruing from such use. The defendant having illegally and wantonly appropriated to its exclusive use a public highway, cannot, in answer to the demand of a citizen who has been thereby obstructed in the exercise of a legal right, and sustained damage, claim an exemption from the consequences of its wrongful act, because such exclusive use by it of the public property is profitable to it, and that it will be injured if its wrongful appropriation and use is not maintained and protected. The suggestion has no place before a judicial tribunal. But if the question is proper to be considered here, the proof in the case conclusively shows that the inconvenience suggested by the defendant's witnesses is purely speculative and chimerical, and at the time the plaintiff attempted to use the bulkhead, &c. no detriment whatever would have resulted to the defendant from such use.

XIV. If the claim urged by the defendant was well founded, the greater part of the city of Brooklyn can be isolated and rendered inaccessible by water, (except at the ferries,) and a component part of the port or harbor destroyed at the pleasure of the few proprietors of the upland on the river. The consequent disastrous result to the most important public interests, commerce, trade and intercourse, and the inevitable and incalculable injury to the city of Brooklyn, forbid that any such claim should be entertained, even if any technical rule of law should seem or could be distorted to justify it.

(*Woolrych on the Law of Waters, &c., p.* 149.) Already, as appears in evidence, access from the river to a great portion of this city is permanently obstructed, and the question presented in this case is one of immediate practical interest and importance.

*B. D. Silliman,* for the defendant.   I. The plaintiff shows by his complaint (as well as by his proofs) that the defendant was *in possession* of the premises in question; that such possession was exclusive, and that the premises were actually inclosed by a fence or wall.   He thus commences by showing that the defendant has the fee of the premises; for such possession imports a fee. (*Day* v. *Alverson,* 9 *Wend.* 223.) He then claims, in his action on the case, damages, because the defendant has not permitted him to use its property as a public wharf, to which use he asserts he had right.   Such claim is inconsistent with the fee thus shown to be in the defendant.

II. But assuming that the plaintiff might prove that the defendant has not the title thus averred by the complaint, yet he has not done so.   The possession of the defendant, and that of those from whom it claims, constitute a good title even against the state.   The plaintiff has failed to show any right personal to himself to use the premises—that he ever had any title to it—or that it is or ever has been a public wharf.   Neither grant, dedication, nor appropriation of it by any legal proceeding, for that purpose, is shown.   If, as claimed by the plaintiff, the defendant has constructed the premises on land below the original high water mark, and thereby encroached thereon by its structure, thus erecting a nuisance, such facts confer no right on the plaintiff to participate in the nuisance.   He never had any right in the *locus in quo,* save that, before the dock was built, he might, in common with "the public," navigate the waters that flowed over it.   The structure, if unlawful or an obstruction to navigation, is at most a *purpresture,* and can be abated only

by the state. No one else can disturb it. The plaintiff has no personal right to use the premises if a *purpresture.* The plaintiff could not have maintained an action against the defendant, even if its structure had been an obstruction greater to him than to others. (*Lansing* v. *Smith,* 8 *Cowen,* 146.)

III. The plaintiff's action (claiming that because the defendant has constructed a wharf it is bound to permit his use of it) is in its nature like an action against a ferryman for not carrying a traveler over his ferry. But the law does not impose on a wharfinger any such duty. There never has been any such rule laid down in any book; *a fortiori,* the law would not impose such a duty without toll being paid or tendered to the wharfinger.

IV. The defendant has title in fee simple to the land and bulkhead in question. (1.) The defendant being the owner of the original *ripa,* had the exclusive title down to the water. No man could land thereon without its permission. "The public have no right to unlade goods, or to moor or tow their vessels on the shore, without leave." (*Lord Hale de jure Maris, &c., ch.* 5, 6. *Morgan's case, p.* 51, *same book.* *Pearsall* v. *Post,* 20 *Wend.* 111, 128.) (2.) It is deducible from the English cases, that the public right to salt and tide water is to be understood with the restriction that such right is to be confined to what is of public use. By the civil law, if nobody sustains damage, he is to be protected who builds on the sea shore. (*Dig. L.* 43, 15, 8.) The common law and the legislature, by its enactments, recognize the same rule, and that the privilege of reclaiming and appropriating to private use a portion of the soil flowed by the tide, is a privilege appurtenant to the conterminous or adjoining upland; and that, therefore, the proprietors of the conterminous upland may inclose and embank upon the water, provided such inclosures or embankments are of no actual injury to the public. (*Angell on Tide Waters, ed.* 1826, 150. *Hale de Portibus Maris, Harg. Tracts,* 85.) The

Wetmore *v.* The Atlantic White Lead Company.

cases in which the sovereign has interfered against the exten-
sion by the riparian owner of his front, upon the land under
water, have been where the extension was an interruption to
navigation. (*Atty. Gen.* v. *Richards,* 1 *Anst.* 603. *Same*
v. *Philpot, Id.* 607. *Same* v. *Cleaver,* 18 *Ves. jun.* 218.
*Bristol* v. *Morgan, Anst.* 607. *Dean of Durham* v. *New
Castle on Tyne,* 8 *Bro. Par. R.* 18.) Whether the encroach-
ment was a nuisance was always held to be a *question of fact,*
(*Hale de Portibus, Harg. Tracts,* 85,) and the rule is so
held in the various English cases. Thus, conceding that the
ultimate ownership of the land under water is in the sove-
reign, such ownership is asserted to the exclusion of adjacent
riparian owners only when required by the public use. The
land under water is to some extent appurtenant to the up-
land. (*Doane* v. *The Broad Street Association,* 6 *Mass.
R.* 332. *Bell* v. *Gough,* 3 *Zab.* 624.) (3.) The sovereign
also recognizes a special interest in the riparian owner to the
land in front under water, by withholding express formal
grants thereof from any other person than such owner. Thus
the commissioners of the land office are forbidden to execute
such grant to any other than the riparian owner. (1 *R. S.*
205, § 80, [67.] *Laws of* 1803, *ch.* 68. *Hale de Porti-
bus Mar. p.* 73.) The cases in which the state has made
grants to other than the riparian owner are strictly excep-
tional. (4.) The riparian owner has also the absolute right,
even against the sovereign, of acquiring the land under wa-
ter by *accretion* thereon. This right to the land in front of
his original ripa is a peculiar incident of his title, and a
qualification of that of the sovereign. (3 *Kent,* 428, *and
cases cited.*) Such gain by accretion is not necessarily re-
stricted to insensible increase and extension of upland from
natural causes. Where there is a gradual accretion, which is
the result of *artificial* causes produced by the lawful use of
the land by the owner, such accretion does not belong to the
crown, and in such case there is no distinction between ac-
cretion produced by natural and *artificial* causes. If, how-

ever, the artificial causes can be shown to have been wrongfully *intended* to produce the accretion, the crown would be entitled. (*Atty. Gen.* v. *Chambers,* 5 *Jurist, N. S.* 745. *Deerfield* v. *Arms,* 17 *Pick.* 41. *Adams* v. *Frothingham,* 3 *Mass. R.* 352.) (5.) It is clearly competent for the sovereign, by express grant, to enlarge the right of accretion, and to permit artificial structures by the riparian owner for the purpose of accelerating the accretion. (*Gould* v. *Hud. River R. R. Co.,* 2 *Seld.* 522.) The state has made such express grant by the statutes below cited, authorizing artificial structures by such owners, for the purpose of producing such increase and a change of the ripa. (6.) The second section of the act of May 25, 1836, (*Laws* 1836, *ch.* 484,) by its terms, makes the line of bulkhead to be located, in pursuance of its provisions, *the permanent water line of the city of Brooklyn.* It was therefore an appropriation of the space shoreward of that line as and for land; and with all the legal incidents attached that appertain in the law to land. There are no reservations of such incidents. The same section further declares: "And thereafter no bulkhead shall be extended *from the upland* in said city, into the East river, beyond such line, *without the previous authority of the legislature,* under the penalty of one thousand dollars," &c. And by section 3 of the same act it is further provided: "Nothing in this act contained shall be taken or construed to destroy, abridge or in any manner impair the rights of the mayor, aldermen and commonalty of the city of New York, in respect to the land between the lines of high and low water, along the Brooklyn shore of the East river. Nor shall this act authorize any *dock or wharf* to be erected upon any of the lands belonging to the city of New York, without the permission of the common council of said city first had and obtained." The act, therefore, indicates three results from its previous provisions: *Firstly.* That, except as against the city of New York, on and within the limits of the lands between high and low water mark belonging to that city, it does recognize, in

some person or persons, other than the city of New York, the right, without any further authority, to work and effect the conversion into fast land of the space appropriated for that purpose. *Secondly.* That the persons on whom that right is conferred were the owners of the upland. *Thirdly.* That the state thereby relinquishes its right of abating any extension by the riparian owner within the limits thus fixed. (7.) This act is not in effect a license, but a grant of some estate in the soil, the action authorized being the *permanent conversion* of the *locus in quo* from river into fast land, and the *perpetual exclusive possession and enjoyment thereof* is not in the law a subject of license. (*Mumford* v. *Whitney*, 15 *Wend.* 384. *Houghtaling* v. *Houghtaling*, 5 *Barb.* 379. *Brown* v. *Woodworth, Id.* 550.) On the conversion authorized by the act, an estate passed, commensurate with the conversion and structures so authorized, which were to be permanent, and the enjoyment thereof by the grantees to be perpetual, an estate not at will but a fee simple. It is true it is not stated that the rights granted by *this* act shall pass to heirs and assigns of the grantees, but this is not now, nor was it at the passage of the act, necessary in a deed, to convey a fee simple, much less is it in a statute where the intent and object govern, comparatively unrestrained by artificial rules. The act contemplates a large expense and outlay by the grantees, and this enlarges the operation of the grant as to the nature and character of the estate passing. The intent that the soil is to be occupied with permanent structures for the use and enjoyment of the grantees is undeniable, and the fee in the soil passes as appurtenant to these structures. (3 *Kent's Com.* 427. *Adams* v. *Frothingham*, 6 *Mass. R.* 332. *Plowden,* 170. *Cro. Eliz.* 704. *Whiting* v. *Olney*, 3 *Mason*, 280. *S.* v. *Case, Cro. Jac.* 526. *Bryan* v. *Weathershead, Cro. Car.* 17. *Doane* v. *Broadstreet*, 6 *Mass. R.* 332.) (8.) The first sections of the act of 1848, (*ch.* 156, *Laws of* 1848,) as amended by chapter 313 of the laws of 1850, reads as follows: "§ 1. It shall be lawful for the *several owners* of

real estate fronting on the water in the city of Brooklyn, between Atlantic street and the dock next east from Jackson street ferry, and *their heirs and assigns,* to erect, construct, build and maintain bulkheads or wharves, and to fill in the same on the lands under water, in front of the lands respectively, so far into the East river as the permanent water line established by law for the construction of bulkheads." § 3 is in the precise language of § 3 of the act of 25th of May, 1856. "§ 3. This act shall take effect immediately." The right to *construct, build and fill in, as well as to maintain* bulkheads or wharves, out to the permanent water line, is given to the heirs and assigns of the owners, &c. forever—a clear abandonment of all right to alter the bulkhead line, unless upon compensation in the exercise of the right of eminent domain, and a clear recognition that an estate in the soil to that line is intended to be granted, and that the estate granted vested, at the passage of the act, in the owners, and was in no way dependent on the erection of the bulkhead authorized, and descended to their heirs and assigns. (*The Fitchburg Rail Road* v. *The Boston and Maine Rail Road,* 3 *Cushing,* 58.) This grant is coupled with no restriction or reservation. All the defendant's structure is within the permanent line mentioned in the act.

V. The state recognizes the exclusive ownership of proprietors who stand in the same position with the defendant, by expressly excepting from the jurisdiction of port wardens, "*private wharves, piers and bulkheads, occupied by the respective owners thereof for special purposes.*" (*Laws of* 1858, *ch.* 226, § 9.)

VI. As to all that portion of the defendant's land which was constructed in 1825, the state is estopped by familiar principles of jurisprudence from disturbing the possession. The improvements were made notoriously and openly, at great expense, and the undisturbed possession by the defendant, and acquiescence by the state, would, independently of the statutes cited, preclude any claim of the state. (*Wen-*

dell v. *Van Rensselaer*, 1 *John. Ch. R.* 354. *Storrs* v. *Barker*, 6 *id.* 166. *Town* v. *Needham*, 3 *Paige*, 553. 1 *Story's Eq. Jur.* 385. *Bell* v. *Gough*, 3 *Zab.* 624.)

By the *Court*, EMOTT, J. This is an action for damages, brought against the defendant, for refusing to permit the plaintiff to unload a cargo of coal upon certain premises in the occupation of the defendant, fronting upon the East river, for the purpose of transportation across these premises to the street. The plaintiff claims no special or private right to the use of the premises, but complains of their appropriation by the defendant as a public injury, and of his exclusion therefrom as a wrong to himself, inasmuch as he is thus deprived of a right which he possesses in common with the whole public. The land upon which the plaintiff sought to deposit his cargo has been reclaimed from the waters of the East river by the defendant or its predecessors and grantors, by filling in and the erection of piers or artificial structures. It lies below the original low water mark of the river, and in its natural bed or channel. There is not, however, any allegation or proof that by these structures the channel of the river was unduly narrowed, or that any injury was done thereby to the navigation of its waters. On the contrary, the structures occupied by the defendant are entirely within an exterior bulkhead line established by legislative authority. (*Laws of* 1836, *ch.* 484.) The claim of the plaintiff to the free and public use of these wharves seems to rest upon two grounds : first, that these erections are an unlawful appropriation by a private person of a public highway, and therefore are a purpresture or a nuisance ; and secondly, that these piers having been erected upon ground covered with the waters of a navigable river, cannot be appropriated to private use, but must continue a highway, precisely as the waters would be if they still covered the land at the place in question. The title of the defendant to these lands is derived from the owners of the adjacent upland by deed, and

Wetmore *v.* The Atlantic White Lead Company.

from the state by act of the legislature, coupled with a re-
lease or conveyance by the city of New York of all their
rights in the lands below the high water mark. The original
shore line and the present exterior line of bulkheads run at
this point in a direction nearly east and west. The original
low water mark was, as I understand the proof, between
twenty and fifty feet north of or below what is now known
as Marshall street, which is the nearest street or road to the
shore running parallel with it. The original high water
mark is not very distinctly proved or indicated, but it would
seem to have been nearly where Marshall street now is. The
city of New York, as I have said, conveyed to one Jackson,
who was then the owner of the adjacent upland, their interest
in the shore, which would seem to have been comprised be-
tween Marshall street and the river, or the then exterior line
of bulkheads. This conveyance was in 1810, and the outer
bulkhead line was at that time north of Marshall street. The
grantors of the defendant derived title from Jackson. The
terms of their conveyances are not stated, but the deeds to
the defendant convey the lands lying north of Marshall
street, and between that and the East river, together with
all rights of docking and filling and using the lands under
water opposite to these lands, and in another instance all
the water rights and lands under water. The title of the
defendant or its grantors to the lands under water, exte-
rior to the original low water mark, and where the wharf was
constructed, in reference to which the present question arises,
is founded upon certain acts of the legislature passed in 1836,
1848 and 1850. In 1836 the legislature, by statute, fixed
the permanent exterior bulkheak or water line of the city of
Brooklyn. (*Laws of* 1836, *ch.* 484.) The defendant's struc-
tures are all within and regulated by this line. They were
erected in part during or before 1836, and in part after that
time and before 1848, when the next statute affecting the
rights of the parties was passed. An act was passed March
31, 1848, (*Laws of* 1848, *chap.* 156,) subsequently amended

in 1850, (*Laws of* 1850, *ch.* 313,) which provided that it should be lawful for the owners of certain lands on the East river in the city of Brooklyn, including among others · these lands, to erect, construct, build and maintain bulkheads or wharves on the lands under water in front of their lands, as far into the river as the permanent water line established by the act of 1836. It is true that the structures now occupied by the defendant had been erected previous to the passage of this act. But they had been erected. by the owners of the adjacent shore and upland, and were upon the territory directly included within the provisions of the law, and it would be an absurdity to hold that while the act of 1848 would, beyond dispute, have authorized the individuals who then owned the shore and adjacent lands to erect new bulk-heads in these waters, if the existing structures were removed, so as to restore the waters to their original condition, it would not sanction the use and maintenance of the erections of a precisely similar character, which they had already placed within these limits. The effect of the acts of 1848 and 1850 undoubtedly was to convey and confirm to the owners of this shore and water front, a title to the lands under water as far as the exterior line of 1836, or to the use of them, for piers or bulkheads, so far as the state was concerned. The defendant has therefore shown a title from the owner of the adjacent uplands, from the city of New York as to the shore between low and high water mark, and from the state to the ownership or use of the lands below .high water mark, as far at least as the acts of 1848 or 1850 have the effect to convey a title. It must be observed, also, as part of the facts in the case, that the place or point at which the plaintiff claimed the right to unload his cargo, was not and never would have been a public street or highway, if the territory in question was regarded as being or having become land. The nearest street on the north was Marshall street, running parallel with the river. Assuming, as I have done in the statement of the facts just made, the most favorable

conditions for the plaintiff, still between the street and the low water mark or bed of the river was the shore, which was neither a highway nor the property of the state or the people, but private property, while beyond this the structure occupied by the defendant extended out to the channel. On the east, Hudson avenue comes down to the river, but it reached the original shore at a point some distance easterly of the place where the plaintiff moored his barge. There is no allegation that the defendant is obstructing the termination of this street upon the river, or appropriating it to private uses. There was something said in the argument for the plaintiff, of a right to have access to the sides of this street. But the street, so far as it extends into the water below the original shore line, is carried out upon the wharves of which the defendant's structures form a part. It was not extended upon a pier into the river, independently or beyond these wharves, nor is there any complaint of obstruction in the way of access to the sides of any pier. If the defendant's structures had not been erected, this street would have had no existence at this point. If the plaintiff has any such rights as he claims, they must grow out of the relations of these wharves to the waters which they have displaced, and not to any streets which have been continued over them, for to none such did the plaintiff bring his vessel.

It seems to me that this brief statement of the leading facts of the case will itself remove many of the difficulties suggested by the ingenious and elaborate argument of the plaintiff's counsel. At least I feel no difficulty in disposing of the questions which it raises.

It was the object of a portion of the argument for the plaintiff to show that the acts of the legislature, relating specially to these wharves or erections, do not operate as grants of the exclusive property of the bulkheads or wharves, but simply to confer a franchise, the right to maintain wharves and to demand wharfage, or the emoluments fixed by law for their use. It might be a sufficient answer to this

argument in the present case, to say that the plaintiff made no offer to pay any compensation to the defendant for the use of their wharf, but asserted an unqualified right to use it as a highway, and under a claim of a general public ease- ment. But it would not be a just construction of the act of 1836 to regard it as merely legalizing the continuance of wharves or bulkheads upon the lands described, without con- ferring any exclusive rights upon the persons who should construct them. These persons were the owners of the up- land adjacent to the river, and they had also acquired the title of the city of New York to the shore. Although the navigable waters of the East river are a public highway, yet this did not authorize the use of the defendant's lands or passage over them, for the purpose of reaching the bed of the stream. The rule of the civil law in regard to the rights of the public to the use of the ripa or bank of a navigable stream for landing, towing, &c., has never been adopted by the common law. On the contrary, the banks of public rivers are, with us, the private property of the adjacent owners, as fully as their other lands, except only where they are crossed by public highways leading to the stream. (*Hale de Jure Maris,* 73, *Harg. ed. Blundell* v. *Catterall,* 5 *B. & A.* 268.) If this property had remained in its natural condition, no one could have asserted a right to land or unlade goods upon the lands of the defendant on the bank of the river, or upon the shore adjacent to it, without their consent. The act of the legislature was intended to confer additional rights and privileges upon the owners of these lands adjacent to the river. It was passed not only to sanction and legalize the structures which they might erect, or which they had erected within the limits defined by the act, so as to protect them from civil or criminal liability for their construction, but to confer upon them the title to these structures, and to the lands which they occupied, or certainly to their exclusive use. The defendant or its grantors had been at great expense in filling in these waters and building these wharves, and so far

as any other individuals or the public at large is concerned, the act of the 31st of March, 1848, must be construed as conferring upon them an absolute and exclusive right to the possession and enjoyment of their wharves, bulkheads, &c. What estate in the lands under water passed or was conveyed by the state, might be a question between the state and the grantors named in the act as their successors. As to third persons, it is sufficient that the statute gives an absolute and exclusive right of possession and enjoyment.

In *The People* v. *Lambier* (5 *Denio*, 9) a question as to the rights of the public to access to the East river, under an act of a similar character to that now under consideration, was presented to this court. It was laid down in that case that the authority given to adjacent owners to fill in and reclaim lands below high water mark, did not authorize the appropriation to private use of any portion of such lands which lay between the original terminus of a street which had been laid out to the river, and the bulkhead in front of such terminus, after the extension of the wharf, under the act. It was held that if such a structure was continued in front of the existing termination of a street upon the river, the public right of way would continue over and across it to the new bank or front of the bulkhead. It follows from the decision, and indeed it was a part of the reasoning of the court, that the public rights of navigation and passage were relinquished by the act, so far as the lands were concerned which had been under the water in front of the property of the persons mentioned in the act, and not in front of the streets. The inference from this decision, as from the whole concert of authorities, is that in such cases the only access of the public to the navigable waters of the stream is by the existing highways upon the land, or their direct prolongation or continuation.

There is no allegation in the present case, and no evidence, that the erection of these wharves was the creation of a nuisance. It is distinctly stated by Ld. Hale, (*De Jure Maris*,

*p.* 85,) and it has always been recognized as the rule of law, that a building below low water mark is not in itself a nuisance. Whether it be so or not depends upon its effect upon the channel or the navigation of the stream, and is always a question of fact. There is no pretense in the present case ·that the channel or the navigation have been injuriously affected by the wharves of the defendant, and therefore no right to abate or to pass over these wharves can be asserted against them as a nuisance. It is impossible, I think, in the face of the act of 1848, and of the act of 1836, establishing a permanent bulkhead line in front of the city of Brooklyn, to regard the appropriation of the waters of the river by these wharves even as a purpresture; but if they were so,.it would not follow, so long as they were not a nuisance, that a private individual like the plaintiff could either abate them or enter upon them without the consent of the owners.

This action, it is contended, may be maintained upon the theory that as the waters which have been displaced by the defendant's wharf were a public highway, the wharf itself became and must continue a part of that highway. How far such a doctrine as this could be maintained in respect to a wharf or structure which had been constructed in the bed of a public river, without authority of law; how far the public would have the same right to pass with carriages over the land thus artificially made, which they had originally, to pass over the water in boats, is a question which need not here be discussed. It would be going to an extravagant length to contend that every. pier or wharf constructed with the sanction of the state, and under legal right by private individuals in or upon the channel of a navigable stream, must become a public highway like the river, and could not be withdrawn from public use. The whole practice of the state in its grants of lands under water, and the rules which have been recognized not only by the land office and the legislature but the courts in reference to such grants, are at variance with such a doctrine. The acts of the legislature to

which I have referred in this case, like the numerous others of a similar character, authorized an appropriation of the lands under water to which they referred, by an artificial accretion to the adjoining lands. They permitted the conversion of the premises from water into land, and relinquished the rights of the public to their use as a part of the channel of the river. When reclaimed and covered with artificial structures, they became a part of the bank of the river, and were no longer subject to the public easement which affected the channel. As far as such artificial accretions are made to public highways upon the bank or shore, they become a part of such highways, but when added to a portion of the bank over which no such right of passage existed, they are a gain to the adjoining proprietor, and do not bring with them a right of use or passage over the land, in consequence of the right of navigation which had existed over the waters which had been displaced by such additions to the land.

We are of opinion that no such public right or easement as the plaintiff claims exists in respect to this wharf, and that he cannot recover in the present action.

The verdict is set aside and a new trial ordered; the costs to abide the event.

[DUTCHESS GENERAL TERM, May 12, 1862. *Emott, Brown* and *Scrugham* Justices.]