PARSONS v. VILLAGE OF RYE et al.

(Supreme Court, Special Term, Westchester County. November, 1912.)

1. MUNICIPAL CORPORATIONS (§ 654*)—STREETS AND HIGHWAYS—ACTION TO ENJOIN TRESPASS—SUFFICIENCY OF EVIDENCE.

Evidence in an action by the owner of land abutting on a highway to restrain defendant village from trespassing thereon, and in which defendant claimed that plaintiff's fence was an encroachment on the highway, *held* to show that such fence was upon substantially the true westerly line of the highway.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1428; Dec. Dig. § 654.*]

2. ADVERSE POSSESSION (§ 8*)—HIGHWAYS—TITLE AND RIGHT OF ABUTTING OWNER.

No length of adverse possession by user upon the side of a highway by an abutting owner can give him title to that part of the highway; the maxim being, "Once a highway, always a highway."

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 14, 27, 43–57; Dec. Dig. § 8.*]

3. MUNICIPAL CORPORATIONS (§ 697*)—STREETS AND HIGHWAYS—ACTION TO ENJOIN TRESPASS—BURDEN OF PROOF.

In an action by the owner of land abutting upon a highway to enjoin a trespass thereon by defendant village, where official surveys and maps as public records, with long and undisputed possession, tended to show that plaintiff's fence was upon the true line of such highway, the burden was on defendant to show some prior official laying out or definition of bounds, making the line of the fence an encroachment.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1502–1505; Dec. Dig. § 697.*]

4. MUNICIPAL CORPORATIONS (§ 654*)—STREETS AND HIGHWAYS—ACTION TO ENJOIN ENCROACHMENT—PRESUMPTIONS.

Where legislative acts relating to the laying out of a highway indicated the general purpose that it should be 66 feet in width, yet left it to the discretion of commissioners to make the width less through any meadow, grove, or cornfield, it cannot be presumed, in the absence of records, that it was laid out in any particular part to that width.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1428; Dec. Dig. § 654.*]

Action to enjoin a trespass by Marselis C. Parsons against the Village of Rye and others. Judgment for plaintiff.

Frederick Wm. Sherman, of Port Chester, for plaintiff.

Graves & Miles, of New York City, for defendants.

MILLS, J. This is an action brought by plaintiff to enjoin the defendant from trespassing upon his land, lying within the village of Rye, in Westchester county, upon the westerly side of the highway known as the "Boston post road," and between that road and Blind brook. The highway there does not run exactly north and south, but more nearly northeast and southwest. For convenience, however, it is herein spoken of as running north and south, and the respective sides thereof as east and west accordingly.

The plaintiff's premises, upon which he resides, have a frontage of nearly 800 feet upon the westerly side of such highway. The stream known as "Blind brook," and anciently as "the Mockquams," enters his land at its northern or northeasterly bound, near the highway, and runs in a curving or irregular line southerly through the same until it leaves it at a point about 360 feet north of the plaintiff's southerly bound, and there passes out of it to the east, going under the highway by a stone arch bridge. The front of the plaintiff's premises—that is, the easterly side thereof—is divided from the highway, or at least the open part of it, by a fence from the bridge northerly to its northerly bound at a private bridge crossing the stream and known as "Halstead's bridge." Such fence, for its southern about 290 feet, consists of a retaining wall, and for the rest of the distance it is of wood.

In the spring of 1909 the defendant, having occasion to build a sewer

in that highway, entered upon plaintiff's premises and began to excavate a trench therein some 10 or 12 feet back—that is, west—of the fence. This the defendant's officers and employés did without any previous notice whatever to the plaintiff. He forthwith began this action, and obtained a temporary injunction. The defendant thus entered upon the claim that the fence was an encroachment within the limits of the highway along the plaintiff's entire frontage north of the arch bridge, to a width varying, but averaging about 15 feet, and including the line of the proposed trench.

In brief, the claim of the plaintiff is that his fence stands upon the true westerly bound of the road, and that of the defendant is that such fence stands within the limits of the highway, and constitutes an encroachment therein, to the extent above stated. The question to be determined, therefore, is: What is the true westerly bound of the highway in front of the plaintiff's premises, north of the arch bridge?

The Boston post road, so called, is one of the most ancient highways in Westchester county, and indeed in all this country. It has existed from the earliest colonial times, and has always been a great thoroughfare, being the principal line or conduit of travel from Manhattan Island, through Westchester county, into the New England colonies or states. One would naturally expect that ample official record of the laying out of such a highway, through such an old and important town as Rye, or at least of official defining of its limits and courses, could be found. Unfortunately, however, there appears to be very little in the nature of such official records, except those made in comparatively recent years. The briefs submitted by the learned counsel indicate clearly that each of them has made most careful and thorough researches into all official records which might possibly embrace this subject-matter; and I am confident that they have, under that head, placed before the court all available data of the kind.

[1] The taking of the testimony was upon several different days, at considerable intervals; and therefore, since the submission, I have deemed it necessary to read and have read all the minutes, examining the several maps and exhibits therewith, and also have read the very able and complete briefs submitted, and thereafter, upon careful consideration, have concluded that the greater weight of the evidence does not establish that the plaintiff's fence is any encroachment upon the highway, but rather indicates that such fence is upon substantially the true westerly bound thereof. I have reached and hold this conclusion for the following principal reasons, viz.: (1) That such fence has been in its present position, and that, too, hitherto unchallenged by any public official, certainly for at least 40 years prior to defendant's alleged trespass, and probably for at least 60 years prior thereto; (2) that the only official records which can be found, purporting to define the limits of said highway in that locality, namely, the Olmsted map of 1868 and the Sands map and survey of 1894, show the line of such fence to be the true westerly bound of the highway; (3) that, while various acts of the Legislature, colonial and state, indicate a purpose that such road be made of the uniform width of 4 rods, or 66 feet, through the town of Rye, and therefore in this locality, and con-

ferred authority upon certain officials to accomplish that result, there is a total want of any report or record of any proceedings to that effect by any such officers as to this locality, and in fact the highway, as it exists to-day, and as it has existed as far back as the memory of living man goes, varies in the town of Rye, in width between the fences or walls, from about 42 feet to about 70, except in certain small lengths or sections, where changes have been made by official action, duly recorded, but not affecting this locality; and (4) that the evidence for the defendant, as far as it appears to be inconsistent with the facts just stated (and there is very little of it thus inconsistent), seems to me of little probative force. In the following I attempt to present these reasons in greater detail:

First. As to the period of the location of plaintiff's fence as it now is, the undisputed evidence shows that it has been so located continuously back to 1868, when the present arch bridge was built. All the witnesses, whose knowledge goes back to that date, agree to that extent. The retaining wall evidently was built when that bridge was constructed; and the evidence leaves it in doubt whether there had been a fence before that time for the space now covered by that wall, as the recollection of the oldest witnesses differs upon that point. Evidently their recollection as to that is hazy and unreliable. As to the space north of the retaining wall, there seems to be a general recollection by them that there was a fence there prior to the building of that bridge; and much the greater weight of such evidence is that such fence was upon the line of the present one. Mr. Kirby, witness for the defendant, testified that he remembered such fence back to 1865, or at least to a time before the present bridge was built, and that it was then in the same position as it now is. The testimony of several of the plaintiff's witnesses carries such fence, in the same locality, back to a much earlier date, viz.: Mr. John E. Parsons, to about 1840; Mr. Worden, to about 1853; Mr. and Mrs. Brown, to about 1860; and Mr. Moore, to about 1866. The defendant's witness, Mr. Miller, testifies that from 1845 to 1850 there was no fence there at all; but it is evident from his testimony that, while he has seen the locality frequently from 1845, he never saw a fence there upon any other line than the present one. Mr. Halstead, witness for the defendant, testifies that he has known the locality since about 1850, and that prior to Mr. Kingsland's purchase of the land now belonging to plaintiff, which was in 1857, there was no fence there at all, and that Kingsland, after his purchase, put up a fence some 10 to 15 feet inside— that is, west—of the present fence, and that such fence was changed to its present location soon after the time that Kingsland sold, which was about 1869. He states that Kingsland's fence was inside of the row of large button ball trees still standing. All the other witnesses agree that, so far as they recollect any fence, it was then outside of the trees. Those are old, large, and very prominent objects, and one who remembers the fence at all would be very likely to remember whether it stood outside or inside of such trees.

It seems to me, therefore, that much the greater weight of the evidence indicates that the fence, as far back as human memory goes

and there was any fence there at all, was at all times in its present location, and that, too, back approximately 60 years from the present time, or nearly 20 years before the arch bridge was built.

[2] I recognize that no length of adverse possession by user, upon the side of the highway, by an abutting owner, can give him title to the part of the highway so encroached upon, and that the maxim in that regard is, "Once a highway, always a highway." Still I think that, in the absence of earlier official records of the laying out or defining the limits of the highway, the fact of such long-continued and unchallenged possession and user is of great significance, as evidence tending to show that the fence was the true bound of the highway. All that period of 60 years back there were public officials whose duty it was to notice encroachments upon such highway and to remove them. Considering the populous character of the locality for at least 150 years back, and especially the fact, hereinafter recited, that the public surveys and maps of Olmsted (1868) and Sands (1894) showed the encroachment of this fence, if it be an encroachment, the fair inference seems to me to be that such officials then believed that the only proof of the limits of the highway was usage—that is, the exact location of its physical bounds, fences, or walls—and that such proof sustained that fence as such bound.

[3] Second. As to official records defining the limits of the Boston post road, it appears clearly that the only known ones are the Olmsted map (1868) and the Sands map and survey (1894), both of which agree with and sustain plaintiff's claim. From 1800 to 1868 this highway, through the town of Rye, was a turnpike road, under the control of a corporation established by chapter 121 of the Laws of 1800. By chapter 549 of the Laws of 1868, a commission of nine persons was created and authorized, at the expense of the several towns in Westchester county through which such road passed, to—

"regulate, grade and macadamize said highway, * * * and to open and remove any and all encroachments that may have been made by any person or persons owning land along said highway, so that said highway shall be of the original width that it was laid out."

The commissioners employed B. S. Olmsted, a surveyor who had long lived in this locality and made many surveys therein, and must have been very familiar with it. He thereafter made a survey of the highway, and a map of it showing his survey, which the commissioners duly adopted, signed, and, on the 5th of August, 1872, filed in the office of the register of Westchester county. That map gives the line of the plaintiff's fence as the westerly bound of the road there, and indicates no encroachment at that point. No evidence shows that that commission in any way decided or intimated that such fence constituted any encroachment. Olmsted seems to have assumed that there was no proof that the highway generally had ever been officially laid out to a uniform width of 66 feet, and therefore to have taken it in the most part as he actually found it, while Kirby later acted upon the contrary assumption, as will hereinafter be more fully shown. I can find, in the evidence, nothing tending to justify Kirby's assumption, except the deed by the trustees of public lands, hereinafter discussed.

The following is the history of the Sands survey and map: It has been, from the earliest—or at least from early—times, a provision of the Highway Law of this state that highway commissioners have power to cause highways, which have been laid out and not sufficiently described of record, and have been used for 20 years or more, to be ascertained, described, and entered of record in the office of the town clerk. Acting apparently under such authority, the commissioners of highways of the town of Rye in 1888 employed Purdy G. Sands, a local civil engineer, to make a survey of the Boston post road, within the town and outside the limits of the village of Port Chester. He thereafter made such survey, and presented it—namely, a map and description—to the commissioners; and they, by resolution passed February 6, 1894, accepted the same and thereupon signed them and filed them in the town clerk's office. As to the locality and bound in question here, this map and survey agree with the Olmsted map. The description gives the courses of the highway from one specified monument to another, but as to its width states:

"Said road varying in width from 42 feet to 70 feet, as shown on map made by Purdy G. Sands, C. E.," etc.

No action whatever was taken by the commissioners subsequently in any way asserting that this fence was an encroachment.

I do not decide that either of those maps, or the attendant proceedings as above recited, constituted any new laying out of the highway, so as to in any respect change its limits or validate any encroachment therein; but each seems to me to be strong evidence that the fence was then in fact no encroachment. It is, I think, to be presumed that the public officials in each case sought to obtain the best information available, and found nothing to question the accuracy of the visible bound, namely, such fence, which they found upon the ground. Certainly those surveys and maps, as public records together with the long and undisputed possession above recited, place the burden heavily upon the defendant to show some prior official laying out or designation or definition of bounds making the line of this fence an encroachment.

Third. There is a complete absence of earlier official record conflicting with the Olmsted survey and map. The following is a brief synopsis of the history of this highway:

It has existed through the town of Rye, upon substantially its present course, at least since 1686. Until 1700 that town was regarded as a part of Connecticut, and, except for a few years, was within the jurisdiction of that colony. At the first settlement of the country the settlers found an Indian trail, known in history as the "Westchester path," which ran in a general direction parallel with the course of Long Island Sound, through the eastern part of the present county of Westchester and into the present territory of Connecticut. Its course in the town of Rye, after leaving Byram river (the northern bound), was straighter and more to the west than that of the present Boston post road, of which it is sometimes said, though apparently erroneously, to have been the origin. It does not appear to have ever been laid out or officially recognized as a highway, except perhaps in limited

sections. The present highway, now and for many years past known as the "Boston post road," may have first been laid out under an act of the Legislature (the General Court) of the colony of Connecticut, passed May, 1672, whereby commissioners were appointed to lay out highways in the township of Rye; but there is no minute or record of any report of the commissioners as to this highway. Conveyances of land in Stamford, and also of land in Rye, exist, speaking of this road as a bound as early as 1686. In 1679 the General Court of Connecticut named the highways already laid out "from plantation to plantation" as "the country road or king's highway," and recommended to the various towns that such roads be "cleared at least one rod wide." This highway is designated as "the country road" on a map in evidence of the town of Rye, dated 1797, and in earlier deeds.

In June, 1703 (Colonial Laws, c. 131), the Legislature of the colony of New York passed an act for the laying out of this road to a "breadth of four rod English measure at the least" from New York City, through that city and Westchester county, to the colony of Connecticut, and provided that the commissioners—

"shall return to the clerk of every county respectively a full and perfect report and description of ye manner and extent of every road they shall from time to time lay out, and the clerk of every county is hereby required to record all and every such return and report as the respective com'rs shall from time to time make to them pursuant to the direccons of this act."

No such return as to this road can be found on file, and no minute or tradition of any such remains. Chapter 270 of the Laws of 1713 (Colonial Laws, c. 270) provided that, for the better attaining of the end designed by such act of 1703, five named persons should be commissioners for Westchester county to review the laying out of roads and to lay out or alter such, and further provided:

"That if any common public road or highway shall lead through any meadow grounds or corn fields, the dimension of the breadth of the said road shall be and is hereby left to the discretion of the said commissioners of each respective county and precinct."

An act passed November 29, 1745 (Colonial Laws, c. 801), named three commissioners for the townships of White Plains and Rye, and empowered them "to regulate the highways and to lay out such other public roads as may still be necessary within the said county of Westchester"—that is, within the said two townships—and provided:

"That if any common publick road or highway shall be laid through any meadow ground or corn fields, the breadth of the said roads shall be left to the discretion of the commissioners or the major part of them for the towns, mannors or places where such road shall run as aforesaid."

An act passed May 4, 1784 (Laws 1784, c. 52), authorized commissioners of highways to be elected in the respective towns, and such commissioners to alter, regulate, and lay out highways, the same to be of the breadth of not more than 4 rods and not less than 3 rods.

No record exists of any laying out or alteration of this highway prior to this last date; but it is abundantly established and a well-recognized historical fact that the road existed and was in use at least 100 years previously. In the absence of any such record, it might per-

haps be presumed that the commissioners under the acts hereinbefore recited, or some one of them, did lay out or relay out this highway in accordance with the authority thereby conferred, and that the record of their such proceedings has been lost; but, even so, there can be no presumption that they laid or relaid it out in any particular section to the width of 4 rods or 66 feet.

[4] While those acts indicate the general purpose that that should be the width, yet they leave to the discretion of the commissioners to make the width less through any meadow, grove, or cornfield; and it may well be that at that time the locality here under consideration came within one or more of those designations. It is well known that the lands along and near the Sound were settled and cultivated sooner than those in the interior of the county, There is, indeed, very slight probability of any laying out, widening, or alteration of this road since the close of the Revolutionary War, with no record of such a proceeding existing. There is no proof indicating the possible loss of any such record. I conclude, therefore, that there is no evidence of the laying out or of the defining of the limits of this road prior to 1868, except by actual usage or physical separation by fences and walls, and that such proof does not at all question the correctness of the plaintiff's fence as a bound there of the highway.

There are later statutes, recited in defendant's brief, under which certain officials had power to relay out this highway to a uniform width of 66 feet; but no record or other evidence of any such proceeding, affecting this locality, is extant, and the probability is very great that, if any such had been taken within such comparatively recent times, due record thereof would still exist. Therefore no detailed statement of such other statutes is here undertaken. Thus chapter 121 of the Laws of 1800, creating the Turnpike Road Company, doubtless authorized that company to widen this highway in this locality to the width of 4 rods; but there is no evidence that the company there ever exercised that power. By the terms of the act, if they anywhere altered the road, so as to widen it and to require additional land, they were obliged to obtain the same by condemnation proceedings, and the record of such proceedings was required to be filed in the office of the clerk of the county of Westchester, to be there recorded by him. No such record exists.

It is true that certain changes in other sections of the highway were made. Some are given in "Baird's History of Rye," from which authority most of the ancient facts herein stated have been taken; and the evidence shows others, one as late as 1894, in a section some distance from this locality. The only evidence before the court here indicating the possibility of any such change affecting this place is a passage in said "History of Rye" at page 144, which states:

"Before this [namely, the construction by the Turnpike Company of the double arch bridge across Blind brook] the road crossed the brook over a wooden bridge, which stood about halfway between the present bridge and the ford."

What such passage means by "the ford" the evidence does not clearly show. It may mean the Gray's farm crossing, which was some

400 feet north of the present arch bridge, or a ford some distance southeast of that bridge, as stated by the defendant's counsel in his brief. All parties here, however, seem agreed that such statement, in such history, must be mistaken. At least all are agreed that a double arch stone bridge built by the Turnpike Company, and which was the immediate predecessor of the present arch bridge, was the bridge in existence in 1832 and for some years prior thereto, and therefore must be the bridge referred to in that deed by the trustees to Brooks.

Fourth. The only evidence of the defendant in any substantial way tending to impeach the accuracy of the plaintiff's fence as a boundary of this highway, except the testimony of Mr. Halstead above reviewed, is a deed by the trustees of the public lands of the town of Rye to David Brooks, one of the plaintiff's predecessors in title, made in June, 1832, conveying the premises between the brook and the road. By chapter 41 of the Laws of 1821, the trustees of the public lands of the town of Rye were authorized to sell two certain pieces of land therein described, one of which, as I am satisfied, was intended to be or to include the land between the brook and this road, and now constituting the front of the plaintiff's premises north of the arch bridge. The act recites that the inhabitants of the town of Rye have lately represented to the Legislature:

"That there are in said town two small pieces of land, hereinafter particularly described, which have lain vacant since the first settlement of the country, except that some persons, without any right or title whatsoever, have lately taken possession of some portions thereof; and that, though the said pieces of land were included in an ancient patent, yet that the owners thereof are now entirely unknown and have never occupied the same nor made any claim thereto for the last fifty years or more, and praying that the same may be disposed of as hereinafter directed."

There is, perhaps, some question whether or not the parcel described in such act as "bounded westerly by Rye brook, southerly by the bridge over the said brook, near the Methodist meeting house, easterly by the turnpike road leading to Boston, and northerly by a part of the glebe land of the rector, wardens and vestry of Christ Church," extends on the south to the highway bridge, or only to the Halstead bridge, which was upon private property, and in which latter case the description would not embrace any part of the plaintiff's premises. But I think that the greater weight of the evidence shows, and I will so find, that such description did include such part of plaintiff's premises; that is, did extend on the south to the present arch bridge. Under the authority of that act, such trustees sold and conveyed to David Brooks that parcel, and conveyed it to him by a deed dated June 16, 1832, the description in which no doubt covers such front of the plaintiff's premises, and began at the northeast corner of the predecessor of the present arch bridge, which is spoken of in the evidence as the "double arch bridge," and runs for the first bound northerly by said road certain courses and distances. The other bounds are given as certain objects—that is, a private road or the brook—and are given without courses or distances. I am entirely satisfied that the surveyor, Mr. Kirby, witness for defendant, has

correctly located the line of the westerly bound of the highway as given in that deed, and correctly reproduced the same upon his map in evidence. That line runs some distance, an average of at least 15 feet, west of the line of the plaintiff's fence, and would include the course of the defendant's attempted trench, and place it well within the limits of the highway.

If that deed stood alone, and did not appear to be at variance with the other evidence in the case, I should regard it as of very great import; but it seems to be at variance with the other proof. It is true that it was made by public officials of the town; but they were not officials charged with any duty in regard to highways. From the fact that the other bounds are given in the deed by physical objects, it is to be inferred that the surveyor of those trustees found no fence along that side of the road in 1832. He may, in fixing such line, have done then as the surveyor witness, Mr. Odell, did lately in laying out the description in that deed; that is, assume that the width of the highway was 66 feet at the northern or northeastern corner of the parcel described, and upon that assumption fixed that point in the description of the premises conveyed. It is quite evident that the surveyor, Mr. Kirby, who for many years has made private surveys in that locality, and for whose judgment in such matters there I have the greatest respect, has always assumed that that road had in early times been laid out to a uniform width of 66 feet. The careful review of all sources of information made at this trial has demonstrated that such assumption is unwarranted. The said deed by the trustees to Brooks is the sole material foundation of the defendant's claim, and doubtless its recent discovery, or at least appreciation by defendant's officials, was the cause of the making of such claim. If that deed recited a fence as the highway bound—that is, ran such bound by and with the fence the stated courses and distances—I should regard it as conclusive evidence that there was then a fence as the visible highway bound upon the line given therein, and would consider that fact as of very great weight in favor of defendant's contention.

In the absence of such recital, and in view of the character of the land as vacant and unclaimed, as indicated by the preamble of the statute under which the deed was given, making it very unlikely that it was at that time inclosed, I conclude that there was then no fence at all between the brook and the highway, and upon such conclusion I cannot perceive, in the very full evidence, upon what reasonable ground or authority the surveyor of the trustees in 1832 ran that boundary of the highway as he did. Even the assumption that the highway had theretofore been laid out to a uniform width of 66 feet would not have justified that line, except for a part of the distance. That line would have made, in 1832, the highway for the rest of the distance wider—at least 70 feet wide, even upon the theory that the wall on the east side was then as far back (that is, west) as it now stands; but the evidence indicates that it is quite likely that since 1832, the date of the deed, that wall on the east side was, by the owner of the premises, there moved somewhat, from 5 to 10 feet out to

the west, thus to that extent narrowing the then apparent highway there.

The learned counsel for the defendant in his brief makes much of the fact that, from about 1873, the owners of the tract of land just north of the plaintiff's premises, on the same side of the highway, have in several conveyances accepted as their bound of the road there a substantial continuance of the line of the deed by the trustees to Brooks. Such is the fact; but its explanation seems to be the attitude of Mr. Kirby upon this question, namely, his assumption of a uniform width of 66 feet. Still through all that period, even up to the present day, the actual fence in front of those premises to the north has stood practically upon the continuation of the line of plaintiff's present fence, and not at all upon the line of the Brooks deed or the continuation thereof.

Therefore, upon the whole case, I conclude that the decision must be for the plaintiff, but without costs. Costs to the plaintiff are not allowed, because I think that the defendant's officers had some reasonable ground for their claim, and it is perhaps well for both parties to have the question finally determined by judicial decision.