(83 Misc. Rep. 194.)

CITY OF NEW ROCHELLE v. NEW ROCHELLE COAL & LUMBER CO.

(Supreme Court, Special Term, Westchester County. November, 1913.)

1. MUNICIPAL CORPORATIONS (§ 646*)—EXTENSION OF HIGHWAY.
    Where an individual constructs a dock at the foot of a highway, the public easement, by the fact of that construction, is extended over the newly made land to the water's edge.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1419; Dec. Dig. § 646.*]

2. JUDGMENT (§ 739*)—CONCLUSIVENESS—MATTERS CONCLUDED.
    As the justice court in 1851 had, under 2 Rev. St. (3d Ed.) pt. 3, c. 2, tit. 4, art. 1, § 2, jurisdiction of an action to recover a penalty not exceeding $100, a judgment rendered by the justice, assessing a penalty against an abutting landowner for obstructing a highway in a town, when affirmed on an appeal, is conclusive against the owner's right to the land occupied as a highway, even though the justice court has no jurisdiction over actions involving the title to land; it appearing that that issue was not raised in the case.
    [Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1105, 1267; Dec. Dig. § 739.*]

3. MUNICIPAL CORPORATIONS (§ 654*)—ACTIONS FOR OBSTRUCTION—EVIDENCE—SUFFICIENCY.
    In a suit to enjoin obstruction of a highway, evidence held to establish that the locus in quo was a highway, and was used as such until a few years before the obstruction.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1428; Dec. Dig. § 654.*]

4. MUNICIPAL CORPORATIONS (§ 657*)—ABANDONMENT—EVIDENCE.
    In a suit to enjoin the obstruction of a highway, where defendant claimed that the highway had been lost by abandonment, under Highway Law (Consol. Laws 1909, c. 25), § 234, the court should be slow to find

that the public easement had been lost by mere nonuser, where it appeared that the municipal authorities in charge had never intended to renounce public rights.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 722, 844, 1429, 1496; Dec. Dig. § 657.*]

5. MUNICIPAL CORPORATIONS (§ 657*)—ABANDONMENT—BURDEN OF PROOF.

Where a defendant claims that a highway has been lost under Highway Law (Consol. Laws 1909, c. 25) § 234, by abandonment, the burden of proving abandonment rests on the defendant.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 722, 844, 1429, 1496; Dec. Dig. § 657.*]

6. MUNICIPAL CORPORATIONS (§ 657*)—WHAT CONSTITUTES ABANDONMENT.

No mere encroachment upon the sides of a highway, so long as any part of it remains open to travel, will constitute an abandonment, and set Highway Law (Consol. Laws 1909, c. 25) § 234, running, nor will any length of the continuance of such encroachment terminate the public easement over the full width of the highway as laid out.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 722, 844, 1429, 1496; Dec. Dig. § 657.*]

7. MUNICIPAL CORPORATIONS (§ 657*) — ABANDONMENT — EVIDENCE — SUFFICIENCY.

In an action to enjoin an encroachment upon a highway, evidence *held* insufficient to establish a six-year abandonment, as required by Highway Law (Consol. Laws 1909, c. 25) § 234, to extinguish the rights of the public therein.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 722, 844, 1429, 1496; Dec. Dig. § 657.*]

8. MUNICIPAL CORPORATIONS (§ 658*)—STREETS—PRESUMPTIONS.

In general, it is presumed that the public has only an easement in a highway or street.

[Ed.. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1430; Dec. Dig. § 658.*]

9. MUNICIPAL CORPORATIONS (§ 658*)—INTEREST OF PUBLIC—PRESUMPTIONS.

The granting of a town's application for a grant of land under water at the foot of a highway raises a presumption that the fee of the highway is in the municipality.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1430; Dec. Dig. § 658.*]

10. VENDOR AND PURCHASER (§ 229*)—BONA FIDE PURCHASER.

One who purchases land abutting on a highway, under a deed describing the land as so abutting, is not a bona fide purchaser of the highway, even though it was not being used by the public at that time.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 477–494; Dec. Dig. § 229.*]

11. MUNICIPAL CORPORATIONS (§ 697*) — ENCROACHMENT ON STREET — ABATEMENT—COSTS.

In an action by a municipality to enjoin obstruction of a highway which had not been worked for a long time, where there was evidence tending to show abandonment, costs will not be allowed the municipality, even though successful.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1502–1505; Dec. Dig. § 697.*]

12. MUNICIPAL CORPORATIONS (§ 697*)—STREETS—ENCROACHMENT.

In an action to enjoin the maintenance of obstructions in a highway, the defendant will not be compelled to grade the surface of the highway,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

where it did not appear that its irregularities were in the main caused by his obstruction, which consisted of lumber piles.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1502–1505; Dec. Dig. § 697.*]

Action by the City of New Rochelle against the New Rochelle Coal & Lumber Company. Judgment for plaintiff.

Hugh M. Harmer, of New York City (Edward W. Davidson, of New Rochelle, of counsel), for plaintiff.

Michael J. Tierney, of New Rochelle, for defendant.

MILLS, J.  This is an action for a mandatory injunction to compel the defendant to remove certain obstructions from a certain specified locality, which the plaintiff claims constitute the southern terminus or part of a highway known as Echo avenue in the City of New Rochelle, and to refrain from further obstructing the same.  The fact of the existence of the obstructions is conceded by the defendant, but it attempts to justify the same by denying that the locality is a highway or a part thereof; and it claims that it is the private property of the defendant, subject to no public easement whatever.  The question in the case, therefore, is this: Was that locality, when this action was commenced, about June, 1911, a part of said highway?  Upon that issue the burden of proof rests upon the plaintiff.

As now physically appearing by present day user, the highway runs southeasterly from Huguenot street to a point about 125 feet north of the water of Echo Bay, a branch or arm of Long Island Sound, and there turns sharply to the southwest, and proceeds thence in that general direction.  The part running southeasterly from Huguenot street is called Echo avenue; and the rest of it, that is the part running southwesterly, is known as Cedar road.  The locality in question is the parcel of land embraced within the lines of said Echo avenue continued southeasterly to the waters of Echo Bay, and being about 125 feet long and 66 feet wide—that is, from west to east—and said to contain 1.925 acres.

By its charter the City of New Rochelle has control of all highways within its limits, its street commissioner being given all the powers of town commissioners of highways, except as otherwise limited by that act.

Although a great volume of evidence has been taken, a careful analysis of it reveals that there is very little conflict as to any material fact, except as to the extent of the public use of the locus in quo during the last 20 years.

It is apparent that the learned counsel have very carefully examined the records in the town, county and state public offices for matter affecting the problem presented by this case, and have placed in evidence all such of which they have learned.  Since the submission of the case I have very carefully examined the record evidence, and other testimony as well, and am convinced that the following material facts are established by the evidence, or at least its greater weight.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The highway now known as Echo avenue is one of the most ancient highways within the present territorial limits of the City of New Rochelle.   It seems to be impossible to find definitely any record of the original laying out of that highway.   Undoubtedly the oldest highway in the locality is the road known generally since Colonial days as the Boston post road, now (within the city limits) called Huguenot street.   Undoubtedly that highway was laid out and traveled by the public prior to the original grant by Pell to Leisler, in 1689, of the 6,000 acres, which shortly thereafter were settled by the Huguenot refugees, and called by them New Rochelle.   This court recently had occasion to investigate the origin of that road, and stated the results of such investigation in an opinion in the case of Parsons v. Village of Rye, 140 N. Y. Supp. 961, at 966.   It was there found that it is impossible to ascertain exactly the original laying out of that highway, and the same appears to be true of the one here under consideration.   The Boston post road is undoubtedly the road which was referred to in the original deed by Pell to Leisler, dated September 20, 1689, as "The Road."   Bolton's History of Westchester County (2d Ed.) p. 583.

The first evidence of the existence of Echo avenue appears to be found in a resolution recorded in the first volume of the New Rochelle Records, at page 4, and there stated to have been adopted by the General Assembly of the Inhabitants of New Rochelle, April 2, 1700.   The record is written in French, but, being translated, reads thus:

"The Great Kings Road from Yorktown to Boston the Assembly has confirmed it as it now stands, being a chain broad, and for the water road the Assembly has also confirmed it as it now stands from the Boston road to the water side, betwixt John Jeffreys and the widow Mackett, and this is to be also a chain broad."

From this record it would seem that the second road therein referred to, as well as the first, which must have been the Boston post road, had previously been laid out, or at least had previously existed. The expression used as to each road is "confirmed it as it now stands."

The researches of the surveyor, Mr. Crosby, who has had very long and extensive experience in that locality as testified to by him, have fully satisfied me that such second road is the present Echo avenue.

In 1711 Captain William Bond, a surveyor employed by the local authorities, made a map of New Rochelle, which appears to be the first one known to have been in existence.  That map remained among the town records, in the town clerk's office, until recent years, when the evidence indicates that it somehow disappeared.  A copy of it is published in Bolton's History of Westchester County, vol. 1 (2d Ed.) p. 686, and is in evidence here.  That map showed four roads as running southerly from the Boston post road to the water, and the most easterly of those roads corresponds with remarkable exactness with the present course and location of Echo avenue.  Thus the distance from the latter highway, along the Boston post road, easterly to the small stream formerly called Stony brook and now known as Crystal Lake stream, is about 1,600 feet upon both that map and the ground at present;  and the area of the land between that stream, on the east, and that highway (Echo avenue), on the west, is about the same on

the map, as it is stated, and on the ground now, namely 42 acres by the map and 44 as now measured on the ground. This excess is readily accounted for by the well-known surplusage of ancient surveys. It is suggested in behalf of the defendant that the second road described in the resolution of April 2, 1700, was the present Center avenue; but the location of that avenue does not at all correspond with the most easterly crossroad shown on the Bond map. Thus the distance from Center avenue easterly along the Boston post road to the present Crystal Lake stream (formerly Stony brook) is more than half a mile instead of 1,600 feet as shown by the map; and the area of the land between that brook and Center avenue is many times 42 or 44 acres. Moreover, it is clear by the record proof (see Town Records, Vol. 1, p. 26), that the present Center avenue was laid out in 1702 to 1703. The record there shows that a committee of four named persons, chosen February 8th of that year, laid out a road from the great way (namely the Boston road) to the water "sade" (side), by the lands of Sicard, near the church.

The evidence appears fairly to locate the present Echo avenue by the adjoining owners and occupants of land as given in the above resolution of April 2, 1700, namely "betwixt John Jeffreys and the widow Mackett." No record of any deed to Jeffreys can be found. The deed by Pell to Leisler, September 20, 1689, recites as including within the 6,000 acres granted—

"also the reversion and reversions, remainder and remainders of a certain lott of land and meadow, now in the tenure and occupation of John Jefferd, and Olive his wife." Bolton's History (2d Ed.) vol. 1, p. 584.

From this it may well be inferred that Jeffreys or Jefferd was a tenant of Pell, and subsequently of Leisler, and probably of the Leisler Mill, which was situated near the outlet of the present Crystal Lake stream. 1 Bolton (2d Ed.) p. 688. Jacob Leisler, the original grantee from Pell, died May 16, 1691. His son and heir, Jacob Leisler, Jr., June 3, 1701, conveyed to Lewis Guion a tract lying east of the present Echo avenue by this description, viz.:

"A certaine parcell of land containing twenty acres of land or thereabouts, lying and being in the Mannor of Pellham called commonly New Rochell in the county of Westchester adjoining to the land of the said Jacob Leislers, belonging to his corn mill on the west of stony brook, formerly in the possession of John Jeffrey and joyning on the north side to the road of Boston on the west to another road comming from the highway to the water side on the south to the creek that goes to the said mill."

It is clear that the road here named as the westerly bound is the present Echo avenue. The subsequent deeds of the parcel on the east of that road are all of record, and they constitute an unbroken chain of title into the defendant, in 1904, of the southern part of the parcel adjoining on the east the locus in quo. In that chain of title the deed by Johnson and others, the heirs of Louis Guion, the grantee of Louis Guion, Sr., dated November 15, 1748, gives as the easterly bound, "east by farm formerly in possession of John Jeffreys." Evidently Jeffreys had remained in possession of the Leisler farm, including the mill to the eastward, after the deed above recited, to Guion, in 1701.

The first known deed of the land to the west of the present Echo avenue is a deed by Jacob Leisler, Sr. to John Mackett, dated May 30, 1690, of 40 acres, bounded on the north by the Boston road, south by the brook, on the east by land of Jacob Leisler, on the west by land of Vilain. It may be noted here that the crossroad, now known as Echo avenue, was not then (1690) in existence, because it is not recited as a bound in that deed, which gives as the easterly bound land (i. e., other land) of Jacob Leisler; but that such road had come into being prior to the deed to Guion, June 3, 1701, because that deed gave that road, viz., "another road coming from the highway to the water side," as the westerly bound of the premises conveyed. John Mackett died prior to 1708, and his heirs, January 11, 1708, conveyed the same tract by the same description (evidently copied) to one Lefferts. There is a break following in the record title of the tract on that (the westerly) side of the road. After the deed in 1708 by the heirs of John Mackett, above recited, the first deed of record is one by Nicholas Bogart to Alexander Henderson, dated February 21, 1794, and from that conveyance the record title is extant and clear into the defendant in 1901; that is, of the southern part of the tract adjoining on the west the locus in quo.

The Bond map (1711) gives the names of several owners or occupants of various tracts. It gives thus "Goun" as the name of that on the tract just east of the present Echo avenue, and "Mrs. Moghead" as that on the tract just west. The spelling "Goun" is evidently an anglicization for the French "Guion." Very little importance is to be attached to any variance in the spelling by Captain William Bond, an Englishman, of the Huguenot proper names upon his map. In that respect he may possibly be considered a pioneer in the modern phonetic spelling.

There is, as above indicated, no record evidence of any title to the westerly tract in any Mrs. Moghead as named on the Bond map, but that map gives as the owner or occupant of the second lot or tract west of the present Echo avenue, "Vallain," whereas the above-recited deed to John Mackett in 1690 gives as the westerly bound of the tract conveyed, "land of Vilain." The variance in spelling here is much less pronounced.

There appears to be no evidence of a John Jeffreys (or Jefferd), or a John Mackett (or Matchett) at about that time located elsewhere than in the above-stated proximity to the present Echo avenue. It seems, therefore, reasonably certain that in the resolution of April 2, 1700, the bound of the road "from the Boston road to the water side," given as (land of) "John Jeffreys," referred to land of Jacob Leisler, Jr., on the east side of the road, then in the occupation of John Jeffreys; and that the other bound of such road, therein given as "the widow Mackett," referred to the land on the west side of the road, which land had been deeded by Leisler, Sr., in 1690, to John Mackett, who had died prior to 1700, and which land was then (1700) in the occupation of his widow; it not being conveyed by his heirs until 1708.

From the fact that the deed to Mackett in 1690 did not mention the crossroad, but mentioned only "the Boston road," it is to be inferred,

I think, that the crossroad, namely the present Echo avenue, was not then laid out or open, and that therefore it must have somehow become established between that date and the passing of the resolution of April 2, 1700. Apparently it was opened by the original Leisler proprietor or his son, as in 1701 the son conveyed to Lewis Guion the land adjoining it on the east, by the deed above recited.

As to the westerly part of the general or entire highway, which part has hereinbefore been designated as Cedar road, and stated to extend southwesterly from the southern foot of Echo avenue, as at present worked and traveled, there is no indication on the Bond map that any highway or way of any sort existed for at least 500 feet to the westward, that is, between the present Franklin avenue and Echo avenue. There is no proof of any opening of that part of Cedar road prior to about 1834, at which date the deed by Harrison to Covell mentions it. The last preceding deed, in 1827, made no mention of it.

Upon the decision, which seems necessary, that the easterly road, running southerly from the Boston post road shown on the Bond map, is the present Echo avenue, the evidence seems conclusive that that highway originally was laid out as going entirely "to the water side," that is, to the very shore of the sound or bay. In the first place, it is so designated in the resolution of April 2, 1700, itself, viz., "as it now stands, from the Boston road to the water side"; in the second place, it is so shown on the Bond map; and, in the third place, it is so described in a long series of the deeds of the land on the east side of that road, indeed uniformly from the deed to Guion in 1701, down to that to David Harrison in 1842, and as well in at least several of the deeds of the tract on the west side of the road, notably in the deed by Bogart to Henderson, February 21, 1794, which speaks of the present Echo avenue as "the road leading from the Boston road to the New Rochelle landing" (apparently to the water); also the deed by Eddy to Morris, January 26, 1813, which uses the same designation of Echo avenue. In considering those deeds of the land on the west side, it must be remembered that there is no proof at all of the existence at their respective dates of any highway or way whatever west from the foot of Echo avenue, or of any access to the water side along Echo avenue through any such other way; and therefore the expression in those descriptions, viz., "the road leading from the Boston road to the New Rochelle landing," cannot be explained upon the theory of any other outlet or approach to the water than the present Echo avenue continued to the water side. In the fourth place, all but two of the old maps in evidence show the road as going to the water side. The Bond (1711), Davenport (about 1800), Bryson (1850), from surveys made in 1846, Beers Atlas (1867), Schuyler (1872), made by order of the board of trustees of the village of New Rochelle, all show the road open to the water's edge; while, on the contrary, only two of such maps, viz., the Jacob (1858) and the Jenkins (1857), show Echo avenue as extending only to its junction with Cedar road. The latter map was made and used in proceedings for the incorporation of the village. The evidence, however, indicates clearly that at the date of the Jacobs and Jenkins maps, David Harrison, the then owner of the lands adjoining to the locus in quo here, had fenced off the foot of

Echo avenue on the southerly line of Cedar road extended, and the question of his right to the land thus inclosed—that is, whether or not the avenue extended to the water—was then in litigation between him and the commissioners of highways of the town. Doubtless the existence of such fence explains those two maps, as will hereafter appear. Such litigation was terminated adversely to the claim of Harrison by means of a final judgment in the action in the justice of the peace court, and by a stipulation in the action in the Supreme Court, both hereinafter recited.

The learned counsel for the defendant contends that the expression "to the water side," used in the resolution and deeds above recited, does not require a literal interpretation, but may well be read and understood as though the words were merely "to near the water side." If the expression were used as of a road of considerable length— e. g., from White Plains to New Rochelle—such interpretation might not seem unnatural, but here the entire length of Echo avenue, from the Boston post road on the north to the water side at the bay on the south, is only a little over 2,100 feet, and the expression was used in the resolution of the local town meeting, Assembly of the Inhabitants, and in the deeds by the adjoining proprietors, so that it seems to be extremely improbable that it was there used in any such approximate sense as is thus suggested.

[1] In 1850 David Harrison had come to be the owner of the land on either side of the locus here in question. Evidently he decided to claim as his own such locus. Naturally, at the foot of the road, Echo avenue, as laid out as above stated, there was by the water side a rocky bluff some 10 to 15 feet above high-water mark, the more precipitous on the west side and the less so on the east. Therefore it is evident that the public user beyond, south, of the southerly line of Cedar road extended was not great. About 1842 Harrison blasted out some of the rock next to the water line, and constructed a rude dock along the water front, thereby to some extent extending the land into the water; but, if such land were then a part of a highway, the public easement of way was, by the very fact of such physical extension, continued over the newly made land to the water's edge. People v. Lambier, 5 Denio, 9, 47 Am. Dec. 273; Wetmore v. Atlantic White Lead Co., 37 Barb. 70, 97.

[2] In June or July, 1850, Harrison built a fence directly across Echo avenue, along the extended southerly line of Cedar road. The commissioners of highways of the town in August, 1850, served notice upon him, pursuant to the statute, ordering him within 60 days to remove such fence as an encroachment "so that such highway may be of the breadth of one chain as originally intended." He failed to obey such order, and the commissioners brought an action against him, before a justice of the peace of the town, to recover the penalties provided by the Revised Statute in such case, namely sections 123, 124, and 125 of article 5, title 1, chapter 16, of part 1, volume 1, of the Revised Statutes, page 637 of the Third Edition.

The complaint claimed penalties amounting to $11, evidently being the penalty of $5 provided by said section 123, and the penalty of 50 cents a day provided by section 125. The written complaint was filed,

and also an answer in writing, which was a general denial, and did not set up the plea of title in question. The case was tried before the justice's court and a jury in January and February, 1851. The verdict was for the plaintiff for $6 damages, and judgment was entered for that and $5 costs, amounting in the aggregate to $11. The defendant duly appealed to the county court, where the judgment was affirmed by order made May 9, 1853, upon which order judgment was entered June 24, 1853, for $15.75 additional costs, making in all $26.75. Apparently at about the same time or shortly thereafter an action was brought in the Supreme Court, by the commissioners of highways, against Mr. Harrison, which apparently, after very considerable delay, resulted in a stipulation and agreement of settlement, dated March 28, 1859, upon which, on motion of defendant's attorney, an order was made at Special Term, April 1, 1861, discontinuing the action.

Said stipulation and agreement provided:

"Second. The road leading from the nineteen mile stone towards Davenport's Neck at the intersection of the Pelham road to be continued in a straight line to the shore at high-water mark. (Note. Cedar road is sometimes called Pelham road, and the nineteen mile stone was at the junction of Echo avenue and Main street.)

"Third. The plaintiffs to blast out the rock of the entire width of the present road and continue the same down to the shore at high-water line so as to form a regular and uniform grade from high-water line at defendant's dock to the valley in the highway opposite the ink factory.

"Fifth. The plaintiffs to have immediate possession to enter upon the inclosed premises of defendant at the picket fence for the purpose of making the northerly part of the road leading to the shore where the same intersects the Pelham road aforesaid.

"Sixth. The plaintiffs to have two years from the first day of April ensuing to complete and finish said work and in consideration of the fulfillment of this stipulation and agreement on the part of the plaintiffs and their successors in office within the time specified then the defendant gives and grants unto the inhabitants of the town of New Rochelle the right to pass and repass and the same shall become a public highway forever."

It seems plain to me that the effect of the judgment in the court of the justice of the peace, as affirmed by the county court, was to determine conclusively, as against David Harrison and all those thereafter to claim under him, which expression includes this defendant, that the locus in quo here in this action involved was, at the time of the rendition of the judgment in the justice's court, viz., February 6, 1851, a part of the highway known as Echo avenue. I have not been furnished by counsel with any copy of the pleadings in the action in the Supreme Court, and am at a loss to understand why that was brought, as certainly at the time when it was brought the public could not have lost their easement, by way of any abandonment, since the judgment in the justice of the peace court. That court then had jurisdiction of an action to recover a penalty not exceeding the sum of $100 (2 Rev. St. [3d Ed.] p. 324, pt. 3, c. 2, tit. 4, art. 1, § 2); and, while it had no jurisdiction to try a question of title to land, yet it had jurisdiction to try an action to recover the statutory penalty for encroachment upon a highway, provided the defendant did not, in his answer, supported by a bond filed, raise the defense or plea of title in question, and provided the plaintiff's own proof did not bring such title in question, or

the defendant did not raise such question or objection. Little v. Denn, 34 N. Y. 452. In the case just cited it was held, also, that evidence of public user was sufficient to sustain such an action in a justice's court.

[3] The return of the justice in the action against Harrison is on file in the office of the county clerk, and is in evidence here. It contains, in extenso, the evidence given at the trial. Such evidence, by living witnesses, showed clearly that back at least to about 1790 the road was open down to the water, but that the locus was difficult of passage, though used considerably by people on foot as a means of access to and from the water; that, prior to the Harrison fence, it had not in that time been fenced except temporarily, about 1794, by Alexander Henderson, who owned the land on the west side for a period of about one year, and that he was very shortly compelled to remove the fence.

Respecting the settlement of the action in the Supreme Court, a resolution was passed by the New Rochelle town meeting, March 29, 1859, that the town hereby ratify the "agreement made by the commissioners of Highways with David Harrison in regard to the dock property as reported by them," evidently referring to the above-recited stipulation dated the preceding day; and also that $500 be raised by taxation and expended by the commissioners—

"in working, grading and extending the highway leading from the nineteen mile stone to the creek (which is Echo avenue) in accordance with the agreement of the commissioners of highways with David Harrison, bearing date March 28, 1859."

At the next annual meeting, March 27, 1860, it was resolved that the sum of $2,000 be raised by taxation for the purpose of finishing and blasting all the remaining part unfinished of the contract at the foot of Echo avenue, at Harrison dock, etc. The written report of such commissioners, submitted at said meeting, shows that $500 had already been expended or contracted for for the purpose "of working, grading and extending the highway called Echo avenue to the water," which sum had been appropriated by a resolution passed at the last annual town meeting; also that the commissioners estimated that it would cost the sum of $2,097 "to complete the excavation of Echo avenue as contemplated," and that they expected that something substantial would be realized from the sale of the stone blasted out during the work.

Between 1859 and 1862 the town commissioners of highways blasted out the rock of the bluff above mentioned, and graded the roadway through the entire locus in quo. The contractor for the doing of the work, Renaud, who has testified here, found Harrison's fence across the locus, on the extended southerly line of Cedar road, still standing, and removed it, and also threw down and removed the Harrison storehouse, which to some considerable extent encroached upon the locus. Harrison did not in any way object to or interfere with the contractor in doing the work. Such improvement made the locus passable by teams. After the completion of that work the town records show that at the town meeting of March 31, 1863, a written proposition from

Harrison, to widen Cedar road through his land, also to rebuild the dock at the foot of Echo avenue, and to remove the stones in the creek in front of that dock, and to work Echo avenue from the line of Cedar road to said dock, on condition that the town pay him the sum of $2,000, was presented. Such meeting passed a resolution in effect accepting such proposition, and levying a tax for the sum of $2,000, and directing that sum, when raised, to be paid over to him. It seems that the financial records of the town for that period were very poorly kept, and counsel have been unable to ascertain whether or not the said sum of $2,000 was actually raised, and, if so, whether or not it was actually paid over to Harrison. Perhaps, after this length of time, it may be presumed that the resolution was actually carried into effect, as it certainly was the duty of the town officials to so act.

On October 13, 1862, the commissioners of highways, in the name of the town, applied to the commissioners of the land office for a grant to the town of the land under water in front of the foot of Echo avenue, alleging that the town was the owner of the upland adjoining the land under water for which application was made. Harrison filed with the commissioners of the land office an opposing caveat, verified by him, wherein he averred that the commissioners of highways had not complied with the terms of the stipulation of March 28, 1859, above recited; and that he, not the town, was the sole owner of the upland in question. The commissioners of the land office, after having considered the matter at several sessions, finally, August 27, 1863, granted the application of the town, and a grant of the land under water at the foot of Echo avenue—that is, in front of the dock—was upon that day issued to the town in due form.

There is no direct proof that Harrison, after the passage of the resolution of March 31, 1863, raising the $2,000 for him, withdrew his opposition to the land grant; but it would seem that his opposition to the claims of the town generally ceased about that time, or at least the evidence thereof appears then to fail. The only subsequent reference to the matter appearing in the town records is the offer of a resolution at town meeting, March 30, 1869, that the "sum of $1,000 be raised by the inhabitants of the town of New Rochelle and paid over to David Harrison or his legal representatives as full compensation for services and benefits bestowed upon the town of New Rochelle, as well also for damages sustained by said Harrison in opening Echo avenue and in blowing down his storehouse and in taking his dock"; but the resolution was laid upon the table, and does not appear to ever have been passed. It is significant that at no town meeting is there any evidence that Harrison claimed that the sum of $2,000, levied by the resolution of March 31, 1863, had not been paid to him. In 1869 he conveyed away the land upon each side of the locus, and by that time appears to have conveyed all of his land in that locality. In the deeds to him of the lands on either side of Echo avenue, that highway appears to be referred to as a bound running to the creek or bay. Thus the deed by Whitney to Covell and Harrison of the parcel on the east, made in 1842, gives as the westerly bound, "thence southeasterly by highway to creek," and the deed of the parcel on the west, by Conk-

lin to Harrison in 1827, gives as the easterly bound, "adjoining the road that leads from White Plains to Davenport's Neck," and recites that the tract formerly belonged to Thomas Eddy, and the deed by Eddy gives as the easterly bound, "thence by and with the said road (the road leading from said Boston road to New Rochelle landing) as the fence now stands, to the said Boston road."

In the deeds by Harrison of the several parcels east and west of the locus, the highway was also referred to as an existing bound to the water, viz., in the deed of the upland on the east side to Thaddeus Davids, in 1850, "thence southerly and easterly in a straight line along the highway to a bolt in a rock," and a deed the same year, by Covell to Harrison of the water front, shows that said bolt was under water; and in the deed of the parcel on the west side of the locus, by Harrison to Hoffmeister and Holm, April 1, 1869, the locus is referred to as "the road claimed by the town of New Rochelle." Certain it is that for many years, practically at least until about when the defendant became the owner of the adjoining lands, the municipal authorities, town, village, or city, exercised control over the locus and the dock as public property, and that, too, without protest from any adjoining owner. Thus, in 1874, the commissioners of highways of the town entered into a written contract with Edward Merritt to repair the dock and grade the locus; and Merritt, June 20, 1874, gave a receipt of payment in full for the doing of such work. In 1881 the town paid a bill of John W. Dampman of $71, "for repairs on town dock, Echo Bay," as appears by his duly audited bill, receipted by him January 4, 1882. On January 16, 1882, the town paid a bill of Andrew Boydan for $25, "for removing obstructions from in front of town dock (upper)," which was the designation then applied to the dock at the foot of Echo avenue.

From the completion of the work done by the contractor, Renaud, 1859 to 1862, for a period of nearly 30 years there was a very considerable public user of the locus in quo as a highway, or rather as a part of said Echo avenue, for access to and from the dock. A large number of witnesses have testified to having teamed up and down that slope, from the dock to the present visibly traveled Echo avenue, using it as a part of that highway, and the dock as a public landing place.

During the latter part of that period Hudson's dock, situated across the arm of Echo Bay southerly from the foot of Echo avenue, came into general use for public traffic, obviously because the depth of water there was greater, and generally the means of access better; dockage being paid to the owner. Later, about 1886, the town, pursuant to a special act of the Legislature, acquired that dock and the neighboring land as a park, now known as Hudson Park, and the dock has since been public, and is now the property of the city. With the development and use of Hudson's dock, the use of the dock at the foot of Echo avenue, then known as the Upper Town dock, very largely ceased.

The owners of the parcels east and west of the locus, subsequent to Harrison and prior to the defendant, while such owners were in actual possession, recognized in various substantial ways the locus as being

part of Echo avenue and a highway. Thus Thaddeus Davids, who, after Harrison, was for nearly all of the time until 1883 the owner of the parcel on the east side, on July 3, 1871, presented to the president and trustees of the village of New Rochelle a petition signed by him, of that date, in which he referred to the dock at the foot of Echo avenue as "the public dock of the village and town," and offered to "co-operate with your honorable body in raising and grading said public dock, which is now and has been for a long time past in a dilapidated state, and which *should* bring in a revenue large enough to keep the whole of Echo avenue and said public dock in complete order and condition for public use and travel." The petition asked permission to blast out rock on the northeasterly side of Echo avenue, near the said dock. Again, June 3, 1872, Davids presented to the village president and trustees another petition, signed by him, calling their attention to the "lower end of Echo avenue near the public dock," and, in substance, asking that the same be top dressed with stone, and offering to pay one-half of the cost of the stone. Again, June 22, 1874, Davids signed another petition to the village president and board of trustees as follows:

"We, the undersigned taxpayers of the village of New Rochelle, respectfully ask your honorable body to appropriate the sum of $150 to grade the approaches on Echo avenue from the south side of Cedar road to Upper Town dock, the appropriation of $250 having been expended in raising and filling in said dock."

He added to his signature these words: "Absolutely required as far as village is concerned."

Again, on August 1, 1876, he signed another petition to the said village authorities "to have sidewalks laid on Echo avenue to Cedar road," in which the signers were designated as, "We, the undersigned property owners, residents and parties transacting business at the docks *at the foot of Echo avenue.*"

Hoffmeister was an owner on the west side of the locus from April 1, 1869 to 1875. On December 10, 1869, he obtained a grant of land under water with this description:

"Beginning at a point where the southerly (more properly southwesterly) boundary line of Echo avenue intersects average high-water mark."

Robert P. Carpenter became a co-owner with Hoffmeister in February, 1870. The deeds to Carpenter and Hoffmeister, and the subsequent deeds in the chain of title, refer to Echo avenue, at the locus, as the "road claimed by the town of New Rochelle."

On the 6th of May, 1872, Hoffmeister and Carpenter presented to the board of trustees of the village a petition, signed by them, as follows:

"The undersigned take the liberty of addressing your honorable body in reference to the town dock at Echo Bay, at the foot of Echo avenue. That this dock is greatly in need of repairs is evident and needs no comment from us, as vessels unloading at this dock and at ours adjoining occupy both in common, it is to the interest of all concerned to have the town dock properly repaired."

The petition makes an offer on the part of the petitioners to make certain specified repairs to the town dock for the sum of $200. Carpenter also signed the petition of June 22, 1874, above recited.

As recently as 1906 this very defendant applied to the city authorities to least the locus at an annual rental of $100, and the common council passed a resolution that such lease be given; but the corporation counsel, upon being consulted, advised that there was no power in the city authorities to lease a part of a public street, and therefore the lease was not actually given. It was prepared by the defendants, and submitted to the city authorities for approval and execution. Such proposed lease bounded the premises sought to be leased as follows:

"Being bounded on the south by the creek or waters of Echo Bay, upon the east and west by lands of party of the second part hereto, and on the north by the extension easterly of the southerly line of Cedar road."

In 1904 the defendant took from the heir of David Harrison, who was then deceased, a deed of his interest as such heir in the locus, which was therein accurately described; and December 16, 1910, the defendant took from the heirs of Mary Conklin, the former owner of the parcel on the west of the locus, who had conveyed the same to David Harrison, a deed of their interest in the locus by a like accurate description.

About 1890 the municipal authorities constructed a sewer in Echo avenue, north of the locus, and put some of the surplus excavation upon the locus, so as to some extent to obstruct the passageway there. About 1903 the city regraded and macadamized Echo avenue for some distance north of the locus, and at that time the contractor dumped upon the locus some of the surplus material which he had excavated. The suggestion is made by the city engineer that his idea in permitting this to be done was that the material should later be used for regrading the locus, which evidently, by reason of its steep slope, needed frequent repairs. It is clear that such obstructions left the locus substantially impassable for teams, except perhaps for a very narrow extent on the easterly side thereof.

At the present time the locus is so obstructed by piles of lumber placed thereon by the defendant as to be entirely impassable to teams, and at least very difficult of passage by pedestrians in any part thereof. It is impossible to determine from the evidence exactly when this entire obstruction began. The proof indicates as well that during the defendant's ownership of the adjoining parcel some excavation was made along the front of the old dock, at the foot of the avenue, making the descent thereto, from Cedar road, more difficult than before, but exactly when that was done or by whom does not appear.

The public claim of right of passage over the locus has never been abated, and even until very recently there has been some user of the locus, including the old dock, by the public as a means of access to boats. At the present time, owing to the building out of the docks upon either side under land water grants now owned by the defendant, the old dock at the very foot of Echo avenue is at the head of a slip or basin, which is still being used, or until very recently was

used, by boatmen and fishermen under the public claim of right, and the locus, or a part thereof, for access to and from the same.

It is abundantly proven that for a period of about 43 years, from 1863, when Harrison ceased his opposition, to and inclusive of 1906, when the defendant applied to the city for a lease, the adjoining owners did not deny or even question the existence of the public easement of way upon and over the locus, and that the same was traveled by the public to some extent during all of that time, and during much the greater part of it to a considerable extent.

Upon the facts thus above recited, I conclude that the highway now known as Echo avenue was originally laid out so as to extend on the south to the water side, and so continued to exist until at least about 1890, and that the locus in quo, as a part of such highway, was traveled both by teams and pedestrians, quite extensively from about 1860 to about 1890.

[4-7] It is contended by the learned counsel for the defendant, in his brief, that, assuming the conclusions above stated to be well founded, yet, by abandonment for more than six years, the public, under section 234 of the Highway Law (Consol. Laws 1909, c. 25), lost their easement of passage, and that therefore the defendant, being the owner of the fee of the locus, now holds the same free and discharged from such easement. He submits that, even if the abandonment was caused by obstructions wrongfully placed and maintained by the defendant, still the statute as to loss of public right by abandonment may effectively apply. Such seems to be the settled law. Horey v. Village of Haverstraw, 124 N. Y. 273, 26 N. E. 532.

Where, as here, the evidence shows clearly that the locus was formerly a public highway, and that no statutory proceedings have been taken to discontinue it as such, and where, as here, it is manifest that the municipal authorities having the matter in charge never intended to renounce the public right, the court should be slow to find that the public easement has been lost by any mere cessation of public user. The burden of proof to establish such abandonment clearly rests upon the defendant. I do not think that such burden has here been successfully borne. It is not clearly established that all public user of the locus had ceased for six years before the commencement of this action. It is well determined that no amount of mere encroachment upon the sides of the locus of a highway, so long as any part of it remains open to travel, will constitute abandonment and set the statute running, and that no length of continuance of any such encroachment will terminate the public easement upon and over the full width of the highway as laid out. Driggs v. Phillips, 103 N. Y. 77, 82, 8 N. E. 514; St. Vincent Orphan Asylum v. City of Troy, 76 N. Y. 108, 114, 32 Am. Rep. 286; City of New York v. De Peyster (1st Dept.) 120 App. Div. 762, 105 N. Y. Supp. 612; affirmed 190 N. Y. 547, 83 N. E. 1123; City of Buffalo v. D. L. & W. R. R. Co. (4th Dept.) 68 App. Div. 488, 503, 504, 74 N. Y. Supp. 343; affirmed 178 N. Y. 561, 70 N. E. 1097.

[8, 9] The learned counsel for the plaintiff contends that the statute as to abandonment does not apply here because the plaintiff owns the fee of the locus, and cites as authority for the law of his conten-

tion the case of N. Y. C. & H. R. R. Co. v. City of Buffalo, 200 N. Y. 113, 119, 120, 93 N. E. 520. I do not think, however, that his contention here is well founded in fact. In general as to a highway the presumption is that the public own only the easement of way, and that the fee of the locus, subject to such easement, remains in the adjoining owners. · It is true that, in passing upon the town's application for a grant of land under water, in front of the dock at the foot of Echo avenue, in 1863, the commissioners of the land office must have decided against the contention of David Harrison that the town was the owner of such fee, and very likely that decision is between the parties to this action and against the defendant, which claims under Harrison, presumptive evidence of such fact. De Lancey v. Piepgras, 138 N. Y. 26, 42, 33 N. E. 822. Still all the facts are proven here upon this trial, and I think that such presumption now stands overcome, and that the ordinary presumption of a mere easement in the public obtains.

As above stated, the evidence indicates that Echo avenue was originally laid out of land the fee title to which was then in Jacob Leisler, son of the original grantee. It is quite probable that the Leislers, father and son, held the land in trust for the Huguenot inhabitants; and it may well be that such inhabitants in 1700, when they by their resolution of April 2d confirmed the laying out of that highway, were dealing with their own lands, and therefore should be deemed to have retained the fee of the land within the highway limits, but the evidence does not appear clear enough to warrant me in so deciding.

After the evidence is thus analyzed and the material facts evolved therefrom as hereinbefore stated, there appears to be no real, substantial question of the plaintiff's right, except that presented by the defense of abandonment. It is difficult to explain why or how the municipal authorities in the last 25 years, while apparently always by words insisting upon the public right, yet have always stopped their improvement of the avenue, viz., grading, macadamizing, guttering, sewering, and sidewalking (except for a short extension of a gutter as an outlet), just short of the locus in quo, and themselves used it, or a part of it at least, as a mere dumping ground.

[10] The defendant is not in the position of an innocent purchaser of the locus because, as above stated, it took its deeds to the adjoining lands with the express notice therein that the town then claimed the locus to be a highway, and that, too, before it took any express conveyance of the locus. Therefore, when it took the fee of the locus, if it did acquire that, whether by its deeds of the adjoining lands or by its express deeds of the locus, it was well advised of the public claim to the alleged public easement.

[11, 12] I decide, therefore, that the plaintiff is entitled to substantially the relief asked in the complaint, to the extent that the defendant remove from the locus its existing encroachments and refrain from any further encroachment thereon, but not that it regrade the same, and in that respect render it fit for present travel, and that the plaintiff may have decision and judgment accordingly, but without costs. I do not allow the plaintiff costs because I think that at the time of the commencement of this action it were well for both parties that the ques-

tions involved should be settled by judicial determination in this court rather than by a resort to summary proceedings. I do not decide that the defendant must regrade the locus because it is not clearly proven to what extent, if any, the present irregularity of the surface, after defendant's encroachments be removed, is due to defendant's acts. Some material part thereof must be due to the plaintiff's own acts in dumping material thereon as above stated.

I may add that the task of considering and deciding this case has been one of very great interest, as well as of much labor, calling, as they seemed to me to call, for the investigation of matters of much historical interest, at least locally, and as well of matters of fact and law not often arising.